United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 26, 2004**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 10, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-31135
_____


BARBARA F. VERCHER,

                                        Plaintiff-Appellant,


        versus


ALEXANDER & ALEXANDER INC.; ET AL,

                                        Defendants,


AON SERVICES CORP; AON RISK
SERVICES INC OF LOUISIANA,
formerly known as Alexander &
Alexander Inc; METROPOLITAN LIFE
INSURANCE CO;

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Louisiana
_____


Before GARWOOD and JONES, Circuit Judges, and ZAINEY,* District
Judge.

_____

        *District Judge for the Eastern District of Louisiana,
sitting by designation.

GARWOOD, Circuit Judge:

Plaintiff-appellant Barbara F. Vercher appeals the district court's grant of summary judgment in favor of defendants-appellees, Aon Services Corporation, Aon Risk Services, Inc. of Louisiana (formerly known as Alexander and Alexander, Inc.) (Alexander), and Metropolitan Life Insurance Company (MetLife), upholding the denial of Vercher's claim for long-term disability benefits. We affirm.

## Facts and Proceedings Below

Barbara Vercher (Vercher), began working for Alexander in 1978 as an Accounting Clerk. She was first promoted in 1979, then again in 1980, 1983, 1986, and finally in May of 1993 to Manager of Administrative Services. Vercher continued to work at Alexander until March 7, 1995.

During the course and scope of her employment with Alexander, Vercher was injured in a motor vehicle accident on February 19, 1991. The accident resulted in injury to her knee, head, and back. In late 1991 she began to experience numbness in her arms and legs. She was referred to Dr. C. Babson Fresh who on October 27, 1992, performed an anterior cervical discectomy and fusion with bank bone at C5/C6 on Vercher. When Vercher returned to Dr. Fresh in December 1992 with continued pain at the base of her neck and in her right arm, Dr. Fresh assessed that the pain was myofascial, and not nerve root in origin. When Dr. Fresh released Vercher in February of 1993, he declared her at "Maximum Medical Improvement."

2

Dr. Fresh eventually recommended medical retirement on April 13, 1995. Another doctor, Dr. Farley Tumbaco, who had treated Vercher from September 28, 1994, also recommended medical retirement.

Vercher ceased working for Alexander on March 7, 1995, because of her alleged disabilities stemming from the 1991 worked-related accident. Vercher had elected coverage under her employer's long-term disability plan which did not entitle her to benefits until six months later.[1] On August 22, 1995, Vercher submitted her application for long-term disability benefits. Soon thereafter, Alexander entered into an Administrative Services Agreement (ASA) with MetLife, which gave MetLife authority to perform certain administrative services related to the Alexander disability plan. The ASA also gave MetLife discretionary authority for determining eligibility for disability benefits and for construing plan terms.[2] Disability under the plan is determined as follows:

> "You are *disabled* if, because of injury or sickness:
> -You are completely unable to perform any and every duty of your regular occupation; and
> -After benefits have been paid for 60 months, you are completely unable to perform the material duties of *any* gainful occupation for which you are reasonably suited by training, education, or experience."

MetLife denied Vercher's claim for long-term benefits on

---

[1] The plan defined eligibility to receive benefits as follows: "The Plan begins to pay you a monthly benefit after you have been disabled for at least 180 days out of a 240-day period, or continuously for a period of 180 days."

[2] Prior to October 1, 1995, Alexander's plan was administered under an ASA with the Aetna Life Insurance Company (Aetna).

November 27, 1995. On January 17, 1996, Vercher appealed MetLife's denial of her claim, maintaining that she was totally disabled and entitled to long-term disability benefits. On November 5, 1996, MetLife denied her appeal adhering to its prior determination that she was not disabled.

Vercher filed this action in state court on February 12, 1998. Appellees then removed the case to federal court on April 21, 1998, asserting exclusive federal jurisdiction over actions for wrongful denial of benefits governed by the Employee Retirement Income Security Act of 1974 (ERISA). The parties filed cross motions of partial summary judgment, and the district court disposed of those motions holding that the MetLife ASA controlled the disposition of the claim, and that MetLife's decision to deny Vercher's claim for disability benefits would be reviewed for abuse of discretion. The parties then filed cross-motions for summary judgment. The district court granted appellees' motion, holding that MetLife did not abuse its discretion in denying Vercher's claim for long-term disability benefits. Vercher timely appealed.

**Discussion**

*1. Standard of Review*

This court reviews the district court's grant of summary judgment *de novo. Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 (5th Cir. 1995) (en banc). Standard summary judgment rules control in ERISA cases. *See Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 202 (5th

4

Cir. 1997). Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Hunt v. Cromartie*, 119 S.Ct. 1545, 1551-52 (1999); *see also* Fed. R. Civ. P. 56(c).

*2. MetLife and the abuse of discretion standard*

Vercher's long-term disability plan was sponsored by her employer, Alexander. The official plan administrator was the United States Benefit Administration Committee of Alexander and Alexander Services, Inc. The plan was not an insurance policy, and there was no insurance policy of which Vercher was a beneficiary. The employees paid into the plan monthly according to the character of plan benefit which they had elected and which the employer agreed to provide. Until October 1, 1995, benefits under the plan were paid by Alexander through an ASA with Aetna. While the Aetna ASA provided that Aetna would determine benefit claims under the plan, it did not expressly give Aetna "discretionary authority" to construe plan terms. The agreement with Aetna was in effect at the time of Vercher's injury, at the time she stopped working, and at the time she filed her initial claim. After Vercher's claim for benefits had been filed, but before it had been decided or presented to Aetna for determination, Alexander entered into the

5

aforementioned ASA with MetLife, effective October 1, 1995.[3] Under the agreement, MetLife had the "discretionary authority for determining eligibility for disability benefits and for construing Plan terms."

Vercher asserts that because there was no such discretionary provision in the agreement with Aetna, and because the Aetna agreement was in effect at the time she submitted her claim, her claim should have been reviewed under the terms of the non-discretionary Aetna ASA, and in turn, the district court should have applied a *de novo*, as opposed to an abuse of discretion, standard.

After the initial hearing, in its memorandum ruling of February 1, 2002, the district court determined that the MetLife, not the Aetna, agreement was controlling, and therefore decided that the standard of review would be abuse of discretion.

In her brief, Vercher "concedes that if [the MetLife] plan was the appropriate plan under which her claim should have been reviewed, then the arbitrary and capricious standard utilized by the District Court was the correct standard." However, Vercher disputes the district court's decision that the MetLife agreement controls. In addition to the fact that she made the required payments to the Plan for disability coverage thereunder, was

---

[3] No MetLife insurance policy is involved in this case; instead, Alexander is required to furnish the money from which MetLife pays the benefits.

6

injured, became disabled and filed her claim for benefits while the Aetna ASA was in effect, Vercher asserts that Alexander deliberately held her claim until the MetLife ASA came into effect.[4]

The district court held that because an ERISA cause of action accrues at the time the benefits claim is denied, the plan in effect at the time of that denial controls the claim. To support its holding, the district court cited an unpublished Fourth Circuit opinion, *McWilliams v. Metropolitan Life Ins. Co.*, 172 F.3d 863, 1999 WL 64275, *2 (4th Cir. 1999), in which the court held that an ASA expressly granting MetLife the discretion to determine eligibility for long-term disability benefits controlled because it was in effect when the applicant's claim was denied, even though it was not in effect when he became disabled.[5]

In the Fifth Circuit, the proper standard under which a district court is to review a plan administrator's benefit determination is governed both by the Supreme Court's decision in

---

[4]In a letter to MetLife nurse C.J. Ferrante, Sue A. Foard, Alexander's Benefits Coordinator, indicated that certain applications, including Vercher's, were being sent via Federal Express to MetLife. Foard then stated, "Thank you very much for your help on these claims. *I had to hold them in my office until everything was finalized between Metlife & Alexander & Alexander."* (emphasis added). That is the sole basis for Vercher's contention in this respect.

[5]"[A]n ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in effect when the decision to deny benefits is controlling." *McWilliams*, *id.* at *2.

*Firestone Tire & Rubber Co. v. Bruch*, 109 S.Ct. 948 (1989), and our subsequent decision in *Pierre v. Connecticut General Life Ins. Co.*, 932 F.2d 1552 (5th Cir. 1991), *cert. denied*, 502 U.S. 973, 112 S.Ct. 453 (1991), in which we construed and applied *Firestone*. In *Firestone*, the Supreme Court held that judicial review of the administrator's determination of plan terms and eligibility for benefits provisions was to be *de novo* unless the plan expressly conferred upon the plan administrator discretionary authority in making such determinations. If discretion were granted, the "abuse of discretion" standard would apply instead. However, in *Pierre*, we held that even where the plan does not expressly give the administrator discretionary authority, "for *factual determinations* under ERISA plans, the abuse of discretion standard of review is the appropriate standard" (emphasis added). 932 F.2d at 1562; *see also Southern Farm Bureau Life Ins. Co. v.* Moore, 993 F.2d 98, 100-01 (5th Cir. 1993); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 597-98 (5th Cir. 1994). Therefore, a plan administrator's factual determinations are always reviewed for abuse of discretion; but its construction of the meaning of plan terms or plan benefit entitlement provisions is reviewed *de novo* unless there is an express grant of discretionary authority in that respect, and if there is such then review of those decisions is also for abuse of discretion.

In light of this standard, we need not in fact determine which

ASA controlled Vercher's claim, because, as we will explain below, we believe that Alexander and MetLife applied a legally correct construction of the plan and its benefit entitlement provisions.[6]

---

[6]Though we do not decide the question, it may very well be that the MetLife agreement does in fact control. After the district court issued its opinion in this case, the Seventh Circuit considered the same question, and stated, "[i]f benefits have not vested [under an ERISA plan], the plan participant does not have an unalterable right to those benefits. The fact that benefits have not vested suggests that the plan is malleable and the employer is at liberty to change the plan and thus change the benefits to which a participant is entitled. Since the employer can change the plan, then it must follow that the controlling plan will be the plan that is in effect at the time a claim for benefits accrues. . . . We have held that a claim accrues at the time benefits are denied." *Hackett v. Xerox Corp.*, 315 F.3d 771, 774 (7th Cir. 2003).

This court, like the Seventh Circuit, has held that an ERISA claim accrues at the time benefits are denied. *See Hall v. National Gypsum*, 105 F.3d 225, 230 (5th Cir. 1997). Therefore, the district court assumed that the MetLife ASA, which was in effect at the time of the denial of benefits, controlled, and in turn applied an abuse of discretion standard.

The Seventh Circuit in *Hackett* appears to have based their decision in part on a theory concerning "vested rights" to benefits. In that case, Xerox stopped paying the claimant's benefits even though they had been started under a different long term disability plan. The court held that there is a presumption against the vesting of benefits unless plan language establishes some ambiguity on the issue. 315 F.3d at 774. Because there was no language suggesting ambiguity on the vesting question in *Hackett*, the controlling plan was held to be the plan in effect at the time the benefits were denied. *Id*.

The lack of vested benefits rights is somewhat troublesome in the present context; for example, under the Seventh Circuit's reasoning, Alexander could have decided to change their plan in September, after Vercher had been on temporary disability for six months and had already applied for long-term benefits, to terminate the long term disability plan altogether. The Summary Plan Description (SPD) does not speak to the issue of whether or not the plan documents expressly authorized Alexander to change or amend the benefits at any time, and the plan itself was never before the district court or made part of the record. Because ERISA does not require a welfare benefit plan SPD to reference

9

*3. The administrator's construction of the agreement*

Vercher claims that the district court erred in its determination that the administrator utilized a legally correct interpretation of the long-term disability provisions of the plan; specifically the definition of "any and every duty."

---

amendment rights or procedures, and because Vercher presented no evidence to the contrary, arguably we could assume that the Plan document itself does allow Alexander to amend or change the benefits.

This court has held that even if an SPD does not discuss amendments or changes to the welfare benefit plan itself, so long as the plan contains such language, benefits can then be amended, modified, or terminated. *See Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 934-37 (5th Cir. 1993) (holding, in a case dealing with a welfare benefit plan, that the fact that no pre-1985 SPD contained amendment or termination language is not "tantamount to a promise to maintain post-retirement health care . . . particularly when (1) ERISA does not mandate the inclusion within SPDs of amendment rights or procedures and (2) any pre-1985 silence is followed by an unequivocal statement to the contrary"). The *Wise* court goes on to hold that ERISA does not require that welfare plan benefits vest, and "[a]lthough ERISA generally allows employers to modify or discontinue such plans at will so long as the procedure followed is consistent with the plan . . . an employer's welfare plan itself may designate a vested benefit," thereby obligating itself contractually to maintain benefits. *Id.* at 937. However, extra-ERISA commitments "must be found in the plan documents and must be stated in clear and express language." *Id.* The record here contains no evidence of vested rights.

Additionally, merely changing ASAs or the discretion given them does not divest participants of benefits, but merely changes procedures. Therefore, it seems likely that before a claim has initially been ruled on by the administrator, simply changing or implementing a new ASA is legitimate so long as it is done before the claim is ruled upon.

However, we need not and do not go so far as to say that it would have been acceptable for Alexander to have simply ended the benefit program so that Vercher would be entitled to no post August 1995 benefits whatsoever even if she were concededly disabled as defined in the plan. We assume, *arguendo* only, that Alexander could not have done so.

In this Circuit, we employ a two-step analysis in determining whether a plan administrator abused its discretion in construing plan terms. *Rhorer v. Raytheon Eng'rs and Const'rs, Inc.*, 181 F.3d 634, 639 (5th Cir.1999). We first determine the legally correct interpretation of the plan and whether the administrator's interpretation accords with the proper legal interpretation. *Id*. If the administrator's construction is legally sound, then no abuse of discretion occurred and the inquiry ends. *Id*. at 639-40. However, if the court concludes that the administrator has not given the plan the legally correct interpretation, the court must then determine whether the administrator's interpretation constitutes an abuse of discretion. *Id*. at 640.

*A. The Legally Correct Interpretation*

In order to ascertain the legally correct interpretation of the plan, we must consider "(1) whether a uniform construction of the [plan] has been given by the administrator, (2) whether the interpretation is fair and reasonable, and (3) whether unanticipated costs will result from a different interpretation of the policy." *Lain v. UNUM Life Ins. Co. of America*, 279 F.3d 337, 344 (5th Cir. 2002). Applying these factors, the district court correctly determined that the essential inquiry here is whether MetLife's interpretation of the plan was fair and reasonable, as Vercher did not allege that the construction of the plan was not

11

uniform or that there were unanticipated costs.[7]

Under Alexander's long-term disability plan, a person becomes "*disabled* if, because of injury or sickness: You are completely unable to perform any and every duty of your regular occupation; and After benefits have been paid for 60 months, you are completely unable to perform the material duties of *any* gainful occupation for which you are reasonably suited by training, education, or experience." The district court correctly determined that Vercher's claim falls under the first part of this definition, requiring her to be "completely unable to perform any and every duty" of her regular occupation.

Vercher appeals the district court's holding as to the legally correct interpretation of "any and every." In its memorandum ruling of September 23, 2002, the district court stated that in order to be considered "disabled" under the plan's definition, "an

---

[7] That distinguishes this case from *Lain* where we read the insurance policy's disability provision to mean that "an insured must be unable to perform only a single material duty of her occupation" in order to be disabled. *Id*. at 345. That was the interpretation the company gave in its first level review of the claim in issue and also it had "previously interpreted the policy in other cases containing a similar definition of 'disability' as requiring a person to be unable to perform only a single material duty of her regular occupation." *Id*. Moreover, in *Lain* the policy language was "cannot perform each of the material duties," while here the plan refers to being "*completely* unable to perform any *and every duty*" (emphasis added). *Lain* does not define "material." We also note that *Lain* (which looked to Texas law to some extent, *id*. at 345) was handed down before *Provident Life and Acc. Inc. Co. v. Knott,* 128 S.W.3d 211 (Tex. 2003), which appears to give a somewhat more restricted meaning to a policy's total disability definition.

employee must be unable to perform all of the duties the employee's occupation demands. It is insufficient, under the Plan's definition, to be unable to perform some of the duties of one's regular occupation. To be eligible for long term disability benefits, an employee must be completely unable to work. . . . As long as Vercher has some ability to work at her position as administrative services manager, she does not meet the required eligibility standard."

We believe that the district court's definition of "any and every" goes too far. In *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455 (9th Cir. 1996), the Ninth Circuit examined a similar provision in a long term disability plan containing the phrase "each and every." That court determined that the phrase was ambiguous[8] because there were two extreme constructions possible: "Reading 'each and every' literally could mean either that a claimant is not totally disabled

---

[8] Eligibility for benefits under an ERISA plan is "governed in the first instance by the plain meaning of the plan language." *Threadgill v. Prudential Sec. Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998). The court interprets ERISA plans in "an ordinary and popular sense as would a person of average intelligence and experience." *Jones v. Georgia Pacific Corp.*, 90 F.3d 114, 116 (5th Cir. 1996) (internal quotation and citation omitted). "Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured." *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997) (citation omitted); *see also Jones*, 90 F.3d at 116 (stating, in relation to the terms of a group life insurance plan, "[w]e have held that in construing ERISA plans we follow the rule of *contra proferentem*").

13

if she can perform any single duty of her job, no matter how trivial – or that a claimant is totally disabled if she cannot perform any single duty, no matter how trivial." 85 F.3d at 458. The court then notes that were the phrase to be given the former construction, total disability would "only exist if the person were essentially non-conscious," while the latter "effectively convert[s] benefits for total disability into benefits for partial disability." *Id*. at 458-59.

The *Saffle* court held that "the Benefit Committee could reasonably interpret the Plan as providing for payment of total occupational disability benefits when the participant is unable to perform all of the substantial and material duties of her regular occupation," i.e., each and every duty *that mattered*. *Id*. at 460. However, the court found that the Committee arbitrarily construed the plan by defining "total disability," which for purposes of occupational benefits depends on whether the participant can perform the duties of her "regular occupation," to include modifications or accommodations to "work available for which she is qualified." *Id*. at 459. In effect, even though the committee had discretion, the court held that their construction of "total disability" was not reasonable because premising "occupational disability" (unable to perform each and every duty of her "regular occupation") on the existence of other "work available for which she is qualified" that would have accommodated her limitations was

14

inconsistent with the plan.  *Id.*

Vercher also cites the Ninth Circuit opinion in *McClure v. Life Ins. Co. of North America*, 84 F.3d 1129 (9th Cir. 1996), where discretion to interpret the plan was not present.  In that case, where the ERISA policy at issue defined disability in terms of the claimant's inability "to perform *every duty* of his occupation," the court determined that "every" was ambiguous, and that the language should be construed against the insurer.  84 F.3d at 1133-34.  The court stated that the "provision should be construed in a practical sense to refer to essential duties. . . . total disability exists if an employee is unable to perform one of the essential duties of his or her position."  *Id*. at 1134.  *Cf. Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216-17 (Tex., 2003) (When total disability is defined as "unable to perform the duties of your occupation," a permissible reading is that a person is totally disabled when he is "unable to perform all of the important duties of his occupation," and therefore, the plaintiff was not totally disabled because he was able to perform "some of his duties.").[9]

From our review of the record, it does not appear that the

---

[9] The court in that case was able to base its decision in part on the definition of "partial disability," which meant that a person was unable "to perform one or more of [his] important daily business duties, or . . . [his] usual daily business duties for at least one-half of the time usually required. . ."  *Id*. at 216-17.  In the case *sub judice*, we do not have an analogous contrasting definition of partial disability respecting the claimant's usual occupation.

district court's definition of "any and every" was the one that Alexander and MetLife actually applied when considering Vercher's disability claim. Rather, Alexander and MetLife seem to have believed that Vercher was able to *do her job*, not just that she could do certain minor or nonessential parts of it.[10]

Specifically, in its letter of November 27, 1995 initially denying her claim, MetLife wrote to Vercher that based on the information provided, "you have the ability to perform *your regular occupation*" (emphasis added). Then, in the November 5, 1996 letter denying her appeal, MetLife stated,

---

[10] A review of the record provided the following examples of the standard definition that was in fact applied by MetLife and Alexander in making their determination of Vercher's disability: "[The] lack of objective evidence found by MetLife was a lack of any psychiatric or neuromuscular impairment to the extent that plaintiff should be prevented from performing *her duties*" (emphasis added), defendants' memorandum in opposition to plaintiff's cross-motion for summary judgment. "[E]vidence in the administrative record indicates that plaintiff was capable of fulfilling *the duties of her occupation* at the time of her alleged disability" (emphasis added), memorandum in support of defendants' motion for summary judgment. See also the following from diverse items of MetLife correspondence during its consideration of Vercher's claim, viz: "Tests performed still do not indicate that [employee] would be unable to perform her occupation as a manager of administrative services;" "FCE found that [employee] was capable of performing sedentary work with modifications for lifting above 5 lbs;" "FCE determinted [sic] that she was able of performing sedentary work on 7-8 [hour day] for her occupation;" "[N]o objective evidence of a neuromuscular or psychiatric impairment which prevents employment;" "Medical evidence does not support claim of inability to perform sedentary work;" "[employee] also treated for depression but it does not appear to be such severity to preclude her from performing her job as a manager of administrative assts;" "Our findings [sic] [employee] is capable of sedentary work."

16

"It was the opinion of the independent physician reviewer that the documentation we have does not demonstrate the presence of a significant neuromuscular impairment *that would prevent you from performing the job activities of an Administrative Services Manager*. This occupation is considered sedentary in nature and not physically demanding. Depression is a treatable condition and the evidence does not support any ongoing impairment that would prevent work. . . . the documentation in your particular case does not support an inability *to perform sedentary types of activities*" (emphasis added).

We must also note that Vercher in fact stipulated for purposes of this case that the "physical demands of plaintiff's job were sedentary in nature."

MetLife's key inquiry was what had changed since 1991, when the accident and injuries occurred, to preclude Vercher, in 1995, from working. In a faxed letter to one of Vercher's doctors, Dr. Fresh, MetLife nurse Ferrante wrote "Information is needed to indicate what precluded her [Vercher] from doing her occupation. . . . Please provide copies of test results and physical exams done that would support a Total Disability to her occupation. Please indicate what happened to preclude her continuing to work since this condition has been in existence since 1991."

After reviewing her records, MetLife's Dr. Petrie's assessment was that "[a] review of the medical records provided does not demonstrate the presence of a neuromuscular impairment which would prevent this claimant from performing her previous job activities as an Administrative Services Manager. . . . This claimant does not have objective evidence of a neuromuscular or psychiatric

17

impairment which prevents her from working."

We are unable to conclude that MetLife applied or utilized other than a legally correct interpretation or definition of plan terms. In deciding that she could perform "her regular occupation," it appears that MetLife essentially determined that, if there were something she was unable (despite reasonable accommodation) to do that was indispensable or essential to the proper performance of her regular occupation, she would have received benefits. However, so long as she was able to perform all the substantial and important aspects of her job, with reasonable accommodation, and any aspects of the job that she could not perform with reasonable accommodation were, singularly or together, *not* indispensable or essential to the job, then she was not disabled.

Therefore, under either a *de novo* or an abuse of discretion standard, we hold that MetLife and Alexander applied a legally correct, fair, and reasonable construction of the plan terms. Because theirs was a legally correct interpretation, we need not determine whether the interpretation itself was an abuse of discretion. *See Lain*, 279 F.3d at 344.

*4. Facts and evidence*

Though we have determined that a legally correct standard was applied, we still must consider whether the facts before MetLife and underlying its decision to deny benefits support that decision

18

or whether its factual determinations were an abuse of discretion. Again, in this Circuit, factual determinations under ERISA plans are examined using the abuse of discretion standard of review; federal courts owe "due deference to the administrator's factual conclusions that reflect a reasonable and impartial judgment." *Pierre*, 932 F.2d at 1562.

The district court correctly noted that the administrative record contains evidence that Vercher did suffer from some degree of disability.[11] For example, Dr. Fresh, one of Vercher's doctors, concluded that she suffered from cervical disc herniation, depression, hyperthyroidism, persistent neck and arm pain, and was severely limited in functional capacity and incapable of minimal sedentary activity. Additionally, doctors Fresh and Tumbaco recommended medical retirement for Vercher.

However, the district court was also correct in noting that the "administrative record also contains evidence that Vercher's disability did not render her completely unable to perform any and every duty of her regular occupation." MetLife had Vercher submit

---

[11]Although Vercher did not appeal the determination, the district court was correct in noting that it could only consider evidence that was before MetLife, and that Vercher could not bring in later evidence to support her position. *See Vega v. Nat'l Life Ins. Servs. Inc.*, 188 F.3d 287, 300 (5th Cir. 1999); *see also Meditrust Financial Services Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)(When both parties have been given an opportunity to present facts to the administrator, the court's review of factual determinations is confined to the record available to the administrator).

to a "Functional Capacity Assessment" (FCA) in 1996 which presented her physical capabilities based upon consistencies and inconsistencies in her performance. The FCA concluded that Vercher had a workday tolerance of seven to eight hours and was able to work at a sedentary level.

Additionally, the district court addressed Dr. Petrie's review of Vercher's records.[12] Upon reviewing the FCA and the findings of those physicians who had treated Vercher, Dr. Petrie stated in an October 24, 1996 letter that there was "no objective evidence of a neuromuscular or psychiatric impairment which prevents employment," and that the "less than maximal effort demonstrated on testing of neuromuscular structures [during the FCA] . . . indicate[s] attempts on the part of an individual to exaggerate impairment. Intolerance for prolonged sitting, inability to balance or walk on the heels and toes, and difficulty climbing stairs cannot be attributed to previous cervical disk surgery."

There is also other factual evidence in the record supporting the administrator's determination that Vercher should not receive long-term disability benefits. Vercher worked for more than four years after she was initially injured in the accident. She accepted a promotion on May 1, 1993, from Manager of Accounting to Manager of Administrative Services, and performed under her new

---

[12] Dr. Petrie did not in fact examine Vercher in person; rather, he reviewed her records and the findings made by the other physicians and nurses who had examined her.

position for nearly two years.  Notably, between March of 1994 and March of 1995, Vercher had only taken seven days off work due to her injury-related illness.  Though she had depression, which her doctor's believed was a result of her 1991 injury and related pain, she was not undergoing special psychiatric treatment.[13]

After she left work, Vercher listed her daily activities to include "light cooking, cleaning, make bed daily - Have to have weekly help for changing beds . . . walk in my yard or sit outside."  Elsewhere in the record, it is stated that since leaving work, Vercher occasionally "works around the yard," which, unlike her job, does not appear to be a sedentary activity.[14]

We agree with the district court that, though medical retirement was recommended by her treating physicians, there was enough evidence in the record to show that Alexander and MetLife did not abuse their discretion by relying on the FCA and Dr. Petrie's conclusions in making their decision to deny Vercher's claim.  *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 602 (5th Cir. 1994) ("[W]e agree with the district court that MetLife's disability determination was not an abuse of discretion. *See Donato*

---

[13] She was, however, taking anti-depressant medication.

[14] Although she argues on appeal that her job was not sedentary, as we have noted, she stipulated for the purposes of this case that it was sedentary, and therefore cannot now deny it.  *See* Pre-Trial Stipulations ("Plaintiff's responsibilities were to direct management of administrative, personnel and accounting department functions.  The physical demands of plaintiff's job were sedentary in nature.")

*v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994) (MetLife's denial of benefits was not arbitrary and capricious when its 'decision simply came down to a permissible choice between the position of UMAC, MetLife's independent medical consultant, and the position of [the claimant's physicians].')").

*5. Treating Physician Argument*

Finally, Vercher contends that the district court erred in determining that it could give no greater weight to the opinions of her treating physicians than to those of the doctors hired by MetLife.  Under *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1016 (5th Cir. 1992) and the "treating physicians rule," this Court held that, under appropriate circumstances, a court is required to defer to a patient's treating physician's testimony unless there is substantial evidence which contradicts it.

Vercher's argument that special, determinative deference had to have been given to the opinions of her treating doctors by both MetLife and the district court, must fail in light of recent Supreme Court precedent.  In *Black & Decker Disability Plan v. Nord*, 123 S.Ct. 1965 (2003), the Supreme Court held that ERISA does not require plan administrators to accord special deference to opinions of treating physicians.  The Court stated,

> "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden

22

of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 1966-67.

Therefore, MetLife appropriately considered Vercher's treating physicians' diagnoses, however, it was not required to give those opinions determinative weight.

## Conclusion

We need not determine which ASA controlled Vercher's claim, because we hold that Alexander and MetLife applied a legally correct construction of the plan and its terms. Based on our review of the record, we find that the facts underlying MetLife's decision to deny benefits support that decision, and therefore it was not an abuse of discretion.

For the foregoing reasons, we conclude that the district court's grant of summary judgment is

AFFIRMED.