# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 25, 2012

No. 11-11165

Lyle W. Cayce
Clerk

LINDA DUDLEY,

Plaintiff-Appellant,

versus

SEDGWICK CLAIMS MANAGEMENT SERVICES INCORPORATED,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:11-CV-28

Before KING, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Linda Dudley sought short-term disability benefits under her employer-sponsored benefit plan for claims of incapacitating knee pain. The plan's admin-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-11165

istrator, Sedgwick Claims Management Services, Inc. ("Sedgwick"), granted disability benefits immediately following two knee surgeries but denied the remainder of the request. After an unsuccessful administrative appeal, Dudley sued for wrongful denial of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). The district court granted summary judgment for Sedgwick, *see Dudley v. Sedgwick Claims Mgmt. Servs., Inc.*, 2011 WL 5080739 (N.D. Tex. 2011), and Dudley appeals. We find no error and affirm.

I.

Working in a clerical position as a Directory Composer for a subsidiary of AT&T, Dudley participated in the AT&T Disability Income Program ("DIP") administered by Sedgwick.[1] After undergoing arthroscopic knee surgery on December 15, 2009, Dudley received twenty days of disability. Sedgwick advised that she would have to submit additional documentation if benefits were needed beyond January 3, 2010.

On December 29, Dudley had a follow-up visit with her surgeon, who noted that the "[w]ound looks good. Stitches were removed." He wrote that Dudley was to start physical therapy and would be seen again in a month, and "[s]o far

---

[1] Both parties refer to the DIP, a "component program" under the AT&T Umbrella Benefit Plan No. 1, as the governing document. The DIP states that "[t]his [summary plan description] along with the AT&T Umbrella Benefit Plan No. 1 is the official document for the benefits offered under the AT&T Disability Income Program . . . . It will govern and be the final authority on the terms of the program." Summary plan descriptions ("SPD") are required by ERISA, 29 U.S.C. § 1022, and are often a separate document, used to "apprise [the plan's] participants and beneficiaries of their rights and obligations under the plan," § 1022(a). The distinction between an SPD and a plan matters; the Supreme Court recently clarified that § 1132(a)(1)(B) allows beneficiaries to enforce the terms of a plan but not an SPD. *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1877 (2011). Because neither party points to an alternative plan document in the record, both parties rely on the DIP as the governing text, and only a plan can be enforced under § 1132(a)(1)(B), we treat the DIP as the plan. *Cf. Koehler v. Aetna Health Inc.*, 683 F.3d 182, 185 (5th Cir. 2012) (treating SPD language as the plan where the two share identical text).

2

so good."

Dudley requested that her benefits continue. On January 4, Sedgwick received records from the December 29 visit and a "Physical Capacities Evaluation" completed by Dudley's surgeon. Based on the December 29 visit, her surgeon wrote on the evaluation form, "no standing, stooping, lifting, or pushing until further notice"; he also indicated that she was incapable of sitting, standing, walking, speaking, looking at a computer screen, or moving a computer mouse. A large portion of the form, asking questions about Dudley's functionality, remained blank. The surgeon concluded that Dudley was to remain off work until further notice.

Sedgwick sent Dudley's records to a physician advisor, who determined there was insufficient objective information to substantiate Dudley's incapacity to perform her occupational duties; as a result, Sedgwick denied Dudley's claim for coverage beginning January 4. With the denial letter, Sedgwick included information on the Quality Review Unit Appeal Procedures, which required "[a] description of how your level of functionality impacts your ability to work and perform your daily activities . . . [and] [c]linical documentation that supports the treatment provider's rationale."

Dudley, her surgeon, her physical therapists, and Sedgwick exchanged several communications over the following months. Sedgwick continued to deny the post-January 4 claim for a lack of clinical evidence, each time including the same information on the appeals process. For example, on January 22, Dudley's surgeon transcribed a letter to Sedgwick describing Dudley's history of care. As to her current status, he wrote, "I have advised her to stay off her leg as much as possible, and I have changed her pain medication to Norco and prescribed a Licoderm Pain Patch. She is to remain off work and is to follow up with me in 1 week." Sedgwick responded that the additional information "does not provide clinical evidence to support disability from January 4, 2010 through your return

No. 11-11165

to work and does not alter our previous denial decision."

Dudley underwent full knee replacement surgery on March 4. Sedgwick eventually approved leave from March 4 until April 14, covering the six weeks following that surgery. Records from that period were submitted to Sedgwick as justification for extending the benefits beyond April 14.

On March 23, Dudley's surgeon noted she was "coming along well" and "[a]s far as work she is still to stay off until further notice." On March 25, Dudley's physical therapist documented some numbness, hypersensitivity, and "burning pain" around the knee. As for Dudley's functionality, Dudley "used a walker for about a week and a half and then has been using the cane. The patient states that she has been driving just short distances to the grocery store; however to come to physical therapy, she is having somebody drive her." The physical therapist commented that Dudley "is going to New York on 04/29/10, and another goal is for her to be able to walk around and sightsee. The patient states that if she has to, she may take more rest breaks than her girlfriends."

On April 1 and 6, Dudley visited with her surgeon again. He acknowledged she was using a cane, her knee was stable, and "[h]opefully she is able to do at least a sit down job now." He also recorded his concerns with her returning to work "due to her leg being in constant pain and swelling," along with the "requirement to use cryotherapy . . . thirty minutes every two hours and we also understand patient was on medication for pain, which is not safe to drive under medication effects."

On April 12, Dudley initiated the formal appeal process, and Sedgwick forwarded her file to two physician advisors for review. By May 25, both doctors reviewed the file and made their initial determination that there was no clinical evidence to demonstrate inability to function in a sedentary job. On June 17, based on her medical records and the physician advisors' reports, Sedgwick denied Dudley's appeal for benefits from January 4 to March 3 and from April 15

No. 11-11165

to her return to work on April 26.[2]  The denial letter stated that "[a]lthough some findings are referenced, none are documented to be so severe as to prevent you from performing the duties of your job as a Directory Composer, with or without reasonable accommodations . . . ."

After the denial, Dudley sued Sedgwick in state court for wrongful denial of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B).  Sedgwick removed to federal court, and both parties moved for summary judgment.  The district court granted Sedgwick's motion, finding that Sedgwick had not abused its discretion in its factual determinations and that its interpretation of the DIP was legally sound. *Dudley*, 2011 WL 5080739, at *7, 9.

## II.

We review a summary judgment *de novo*, applying the standard of review of the district court.  *Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.*, 573 F.3d 210, 213 (5th Cir. 2009).  Summary judgment is appropriate where, viewing the evidence in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Koehler*, 683 F.3d at 184.

This appeal involves reviewing the administrator's factual determination and interpretation of the plan.  Factual determinations made by an administrator are reviewed by a district court for abuse of discretion.  *Dutka*, 573 F.3d at 212. Similarly, where the plan grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Herring v. Campbell*, 690 F.3d 413, 415 (5th Cir. 2012), courts review the administrator's interpretation for abuse of discretion.  *See also Metro. Life Ins. Co. v. Glenn*, 554

---

[2] Sedgwick did grant Dudley additional benefits for May 6 to May 23, 2010, for knee manipulations.  She returned to work with restrictions against pushing and pulling and was provided time to heat and ice her knee.

No. 11-11165

U.S. 105, 111 (2008).

It is undisputed that the terms of the plan grant Sedgwick the necessary discretionary authority. The DIP states that the plan administrator "will have sole discretion to interpret the Program, including, but not limited to, interpretation of the terms of the Program, determinations of coverage and eligibility for benefits, and determination of all relevant factual matters."[3]

In the ERISA context, abuse of discretion is the "functional equivalent of arbitrary and capricious review." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (per curiam). An arbitrary and capricious decision is one "made without a rational connection between the known facts and the decision."[4] This deferential review does not require a complex inquiry into the decision: "[I]t need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end."[5]

## A.

We first consider whether Sedgwick abused its discretion in interpreting the plan. Dudley asserts that the DIP requires only "medical documentation" and that Sedgwick's rejection for a lack of objective findings of functional limitations is an abuse of discretion.[6]

---

[3] *See also Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1305–06 (5th Cir. 1994) ("This court has not imposed a linguistic template to satisfy this requirement, but in this case the plan's plain language provides that the administrator may make an independent and final determination of eligibility.").

[4] *Meditrust Fin. Servs. Corp. v. Sterling Chems. Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828 (5th Cir. 1996)).

[5] *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009) (quoting *Corry v. Liberty Life Assurance Co.*, 499 F.3d 389, 398 (5th Cir. 2007)).

[6] Sedgwick maintains that the plan's terms are not ambiguous. Even assuming the plan is ambiguous however, Sedgwick's interpretation was not an abuse of discretion.

No. 11-11165

This court often applies a two-step analysis to review an administrator's interpretation of a plan:

> A court first determines the legally correct interpretation of the plan, and whether the administrator's interpretation accords with the proper legal determination. If the administrator's construction is legally sound, then no abuse of discretion occurred and the inquiry ends. But if the court concludes that the administrator has not given the plan the legally correct interpretation, the court must then determine whether the administrator's interpretation constitutes an abuse of discretion.[7]

For the first step, the court asks whether the interpretation is legally correct. ERISA plans are "governed in the first instance by the plain meaning of the plan language."[8] Typically, the question whether an interpretation was legally correct is governed by three factors: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan."[9] If the administrator's interpretation is determined to be legally correct, there is no abuse of discretion, and the inquiry is complete. *Rhorer*, 181 F.3d at 639–40.

The second step asks whether the administrator's interpretation was an abuse of discretion. This step is reached if that interpretation is legally incorrect. Alternatively, the first step can be skipped "if we can more readily determine that the decision was not an abuse of discretion." *Holland*, 576 F.3d at 246 n.2. This court often considers three factors in determining whether the admin-

---

[7] *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 639–40 (5th Cir. 1999) (citations omitted), *abrogated on other grounds by Amara. But see Duhon*, 15 F.3d at 1307 n.3 (stating that "the reviewing court is not rigidly confined to this two-step analysis in every case").

[8] *Tucker v. Shreveport Transit Mgmt. Inc.*, 226 F.3d 394, 398 (5th Cir. 2000) (quoting *Threadgill v. Prudential Sec. Grp., Inc.*, 145 F.3d 286, 292 (5th Cir. 1998)).

[9] *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 270 (5th Cir. 2005); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).

istrator abused its discretion: "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *Wildbur*, 974 F.2d at 638.

Here we choose to bypass the legal correctness of the interpretation, because we conclude that it was not an abuse of discretion. *See Holland*, 576 F.3d at 246 n.2; *High v. E-Systems Inc.*, 459 F.3d 573, 577 (5th Cir. 2006). Looking to the three-factor test, the first is the internal consistency of the plan under the interpretation. *Wildbur*, 974 F.2d at 638.[10] Sedgwick's requirement of objective evidence of functional occupational limitations is consistent with the DIP's requirement of medical documentation of disability, defined as being unable to perform the functions of one's job. As Sedgwick argues, the DIP's failure specifically to include the word "objective" is not automatically inconsistent.

Similarly, in *Anderson*, 619 F.3d at 509, the plan provided disability benefits if a participant was unable "to perform any and every duty pertaining to his occupation." The beneficiary's physician provided records concluding that he was unable to do his job because of intensified symptoms of post-traumatic stress disorder. *Id.* The plan's reviewing physicians, and eventually the administrator, determined there was a lack of documentation to support an occupational impairment that would prevent the claimant from working. *Id.* at 510. This court found that a "plan administrator does not abuse its discretion by making a reasonable request for some objective verification of the functional limitations imposed by a medical . . . condition." *Id.* at 514.

---

[10] Dudley argues that this factor is irrelevant, citing *Rhorer*, 181 F.3d at 643, for the proposition that when an SPD is involved, the internal-consistency factor does not matter. More accurately, *Rhorer* rejected reliance on consistencies between an interpretation and a plan document to determine whether the interpretation of an SPD was an abuse of discretion. *Id.* In this case, there is only one document. More importantly, *Rhorer* used the factors to litigate the interpretation of an SPD under § 1132(a)(1)(B). In the wake of *Amara*, Dudley cannot pursue a similar claim.

No. 11-11165

Here, the DIP defined disability as being "unable to perform all of the essential functions of your job or another available job assigned by the Participating Company with the same full-time or part-time classification for which you are qualified." As with *Anderson*, the interpretation requiring objective verification of functional limitations is not inconsistent with the plan's text.

Addressing the second factor, we consider relevant regulations. *Wildbur*, 974 F.2d at 638. On appeal, Dudley presents only regulations governing SPDs, but "*CIGNA* does not disturb our prior holdings that (1) ambiguous plan language be given a meaning as close as possible to what is said in the plan summary, and (2) plan summaries be interpreted in light of the applicable statutes and regulations."[11] For this reason, we consider the regulations Dudley relies on.

Dudley asserts that Sedgwick's interpretation is an abuse of discretion because SPDs must include "a statement clearly identifying circumstances which may result in . . . loss, forfeiture, [or ]suspension . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits." 29 C.F.R. § 2520.102-3(*l*). Sedgwick's interpretation satisfies that regulation.

Under "Discontinuance of Benefits," the DIP states that benefits will terminate if "[y]ou no longer meet the requirements for Partial Disability or Total Disability as determined in the sole discretion of the Claims Administrator." The definitions of disability, illness, and injury refer to the ability to perform "the essential functions of your job" and the "duties of any job assigned." Furthermore, participants are notified that benefits will be denied if they "fail to provide Medical documentation or other information reasonably required by the Claims Administrator for purposes of administering [the] claim." For the same reasons, Dudley's argument under 29 C.F.R. § 2520.102-2(b) also fails, that "[t]he format

---

[11] *Koehler*, 683 F.3d at 189 (referring to *Amara*, holding that terms of a summary plan description cannot be enforced through § 1132(a)(1)(B)).

9

of the summary plan description must not have the effect to misleading, misinforming or failing to inform participants." Relevant regulations do not demonstrate that Sedgwick's interpretation was an abuse of discretion.

The third factor considers "the factual background of the determination and any inferences of lack of good faith." *Wildbur*, 974 F.2d at 638. Dudley claims that this factor points to an abuse of discretion, because Sedgwick, in alleging bad faith and violation of its guidelines, posed conclusional questions to the consulting physicians. Even assuming, for purposes of summary judgment, some of the questions were inappropriate is not sufficient to say that Sedgwick's interpretation was an abuse of discretion. Sedgwick also asked the physicians more appropriate questions, such as "What are the clinical findings contained in the medical record and how would it impact the employee's ability to function?"

The factual background instead demonstrates Sedgwick's good faith. First, it granted Dudley benefits following her two knee surgeries and for later procedures. Second, immediately upon becoming aware of Dudley's condition, it communicated, in a letter dated December 8, 2009, that "to qualify for benefit payments under the AT&T disability plans, your medical condition should involve a sickness or injury, supported by medical documentation that prevents you from performing the duties of your job." That letter also stated, "[i]t is critical that your physician demonstrate by his/her observations and clinical findings that you are unable to perform your work"; and "[i]f the medical documentation does not contain information that establishes that your condition prevents you from performing the duties of your job with or without accommodations, your claim will not qualify for benefit payments under AT&T disability plans."

Sedgwick also contacted Dudley after each denial or submission of insufficient documentation. With each denial letter, Sedgwick included the appeal procedure, specifically noting that the provider must submit "a clear outline of your

level of functionality, a description of how your level of functionality impacts your ability to work and perform your daily activities, a detailed description of the treatment provider's rationale for your level of functionality, clinical documentation that supports the treatment provider's rationale." Sedgwick also communicated with Dudley's provider: "Please provide us with the specific functional limitations preventing your patient from working at this time," and it asked for specific evaluations on various tasks. Further demonstrating Sedgwick's good faith, all three of the reviewing physicians attempted to contact Dudley's treating physician, but their calls were never returned.

Considering these three factors, Sedgwick did not abuse its discretion interpreting the DIP to require objective medical evidence demonstrating Dudley's occupational limitations. Sedgwick's interpretation was reasonable and far from arbitrary. *See Holland*, 576 F.3d at 247.

B.

The district court and this court on *de novo* review consider a plan administrator's factual determinations for abuse of discretion. *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). Deference is given to the administrator's decisions "that reflect a reasonable and impartial judgment." *Id.* at 231 (citing *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991)). The abuse-of-discretion standard examines whether the administrator's factual determination was arbitrary and capricious. *Meditrust*, 168 F.3d at 214. An administrator's determinations are affirmed when supported by substantial evidence. *Ellis*, 394 F.3d at 273. "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Holland*, 576 F.3d at 246 (quoting *Meditrust*, 168 F.3d at 215).

Dudley contends that Sedgwick's determination that she was not disabled

was an abuse of discretion.  First, Dudley argues that there was no concrete or substantial evidence to support Sedgwick's denial, because (1) she showed evidence to support her claim, (2) Sedgwick ignored clinical evidence from her treating physician, and (3) Sedgwick did not focus on her pain.

Dudley asserts that because she can show evidence to support her claim of disability, Sedgwick's determination must be wrong.  The amount of evidence Dudley presents is irrelevant:  "This argument misapprehends the burden of proof under ERISA.  The law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, *not* that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability."  *Ellis* 394 F.3d at 273.

Next, Dudley argues that the denial was not based on concrete evidence, because Sedgwick allegedly ignored and disregarded clinical evidence from the treating physician.  The record refutes that claim.  In *Meditrust*, 168 F.3d at 215, this court held that the administrator "fully and adequately reviewed [the beneficiary's] claim," because the denial letters expressly contained the basis for denial, the plan reviewed all of the relevant medical documentation, and physicians reviewed the hospital records.  Sedgwick did all of those things.

Furthermore, Sedgwick does not have to defer to the treating physician.  "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians."[12]  Choosing not to defer to the treating doctor is not the equivalent of ignoring his opinion.  "[T]he experts here were not required to accept the opinion of [the] treating physician that his symptoms rendered him incapable of performing his job.  This was neither arbitrary nor an abuse of discretion. . . ."  *Anderson*, 619 F.3d at 513.  Dudley's surgeon reported her "debilitating pain" and concluded she should remain off work.  Sedgwick did not abuse

---

[12] *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 249 (5th Cir. 2007) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003)); *Vercher*, 379 F.3d at 233.

its discretion in deferring to its medical experts instead of to Dudley's surgeon's conclusions. "[T]he administrator, under the established standard of review that restricts the courts, was not obliged to accept the opinion of [the] physicians. In this 'battle of the experts' the administrator is vested with the discretion to choose one side over another." *Id.* (quoting *Corry*, 499 F.3d at 401).

Relatedly, Dudley also contends that because Sedgwick did not focus on her pain, the denial was not based on substantial evidence. In *Corry*, 499 F.3d at 399–400, this court held that the administrator had sufficiently considered the beneficiary's subjective complaints, because it cited the complaints in its denial letter and physician reports. "Thus, although it is certainly true that [the administrator's] references [to the beneficiary's] subjective complaints were less prominent than [the administrator's] emphasis on the lack of objective medical evidence of a disability, it is clear that [the administrator's] analysis considered [the] subject complaints of disability." *Id.* at 400. In its final denial letter, Sedgwick acknowledged Dudley's complaints of pain, as did the consulting physicians in their reports.

Despite Dudley's claims to the contrary, Sedgwick's factual determination was based on substantial evidence. Sedgwick only needs to present evidence such that a reasonable person could find it adequate to support the conclusion. *Ellis*, 394 F.3d at 273. In *Corry*, 499 F.3d at 402, the insurance company relied on the medical opinions of three consulting physicians, who found a lack of objective evidence that the beneficiary was disabled. We responded that "[i]t seems indisputable that the medical opinions of [the administrator's] three consulting physicians, each of whom are [*sic*] specialists and qualified experts in their fields specifically related to [the claimant's] symptoms, constitute substantial evidence supporting [the administrator's] determination that [the claimant] has no disability that would preclude her from performing sedentary work." *Id.* Similarly in *Anderson*, 619 F.3d at 513, this court concluded that "[the administrator] did

not abuse its discretion by relying on the independent experts' opinion that [the claimant] had not offered clinical objective proof showing the functional effect of his PTSD."

Sedgwick's determination was supported by its medical experts, who included a family-practice physician, an orthopedic surgeon, and a physical-medicine and rehabilitation specialist. The experts' conclusions that there was a lack of objective evidence supporting an occupational limitation serve as substantial evidence.

Dudley also asserts that the physicians' reports that Sedgwick relied on have no rational connection to the evidence and did not give full force to her symptoms.[13] Because the reports relied on facts not in Dudley's favor and did not accept all of her surgeon's conclusions, she argues there was no rational connection to the evidence. She relies on *Martin v. SBC Disability Income Plan*, 257 F. App'x 751 (5th Cir. 2007), which can be distinguished from the instant case. There the reports from the treating physicians were more detailed, regarding functionality, than were Dudley's medical records:

> [The claimant] has outbursts of anger and difficulty concentrating, is barely able to function and only able to perform the most basic activities of daily living. . . . [She] is unable to work because the basic functions of her job, interacting with the public, driving a company vehicle . . . would be difficult for [her] to perform because of her inability to concentrate.

*Id.* at 754.

Though Dudley's medical records state that she suffered major knee problems with resulting pain, her records do not state how her knee injuries affected her ability to function in a sedentary job. Furthermore, the physicians' reviews

---

[13] *See Holland*, 576 F.3d at 246 ("A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." (quoting *Meditrust*, 168 F.3d at 215)).

were based on a full record, and their reports cited to Dudley's medical reports.[14]

Sedgwick's determination of Dudley's disability was not an abuse of discretion. The decision requires evidence that is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 273 (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)). Because Sedgwick's decision was rationally related to the facts and based on substantial evidence, gathered from Dudley's physician and physical therapists, along with independent experts, the district court correctly granted summary judgment for Sedgwick. *See Holland*, 576 F.3d at 246.

The summary judgment is AFFIRMED.

---

[14] *See Meditrust*, 168 F.3d at 215 ("Our review of the record supports the district court's finding that the Plan fully and adequately reviewed [the] claim. The denial letters expressly contain the basis for the denial . . . . Moreover, the Plan's review was based on a full record. In fact, a collection agency retained by [the administrator] forwarded to the Plan 'all of the medical records and supporting documentation.'").