**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 31, 2012

No. 11-10458

Lyle W. Cayce
Clerk

NANCY KOEHLER,

Plaintiff - Appellant

v.

AETNA HEALTH INC,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, HAYNES, and GRAVES, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiff-Appellant Nancy Koehler appeals the district court's summary judgment dismissing her suit to recover health insurance benefits under an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Defendant-Appellee Aetna Health Inc., a Texas health maintenance organization ("HMO"), provides and administers the plan's health insurance benefits under an agreement giving Aetna discretion to interpret the plan's terms. Aetna refused to reimburse Koehler for care she received from a specialist outside of the Aetna HMO to whom she had been referred by a physician in the HMO. Aetna denied her claim because the referral was not pre-authorized by Aetna. The district court found

No. 11-10458

as a matter of law that Aetna did not abuse its discretion in denying coverage. We find that the plan is ambiguous and the need for pre-authorization was not clearly stated in Aetna's summary description of the plan. And under the circumstances of this case it cannot be said as a matter of law that Aetna did not abuse its discretion in denying coverage.

We REVERSE the district court's judgment and REMAND the case for further proceedings.

## I. Standard of Review

We review a summary judgment *de novo*, applying the same standards as the district court. *Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, 592 F.3d 687, 690 (5th Cir. 2010). Summary judgment should be affirmed "if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 (5th Cir. 2011).

## II. Background and Proceedings Below

Koehler suffered from chronic sleep apnea. In 2007, her primary care physician in the HMO referred her to Dr. Raj Kakar, another doctor in the HMO. After attempting various treatments, Dr. Kakar concluded that Koehler should use a dental device designed to prevent her airway from closing during sleep. After consulting with her primary care physician, Dr. Pedro Checo, Dr. Kakar referred Koehler to a specialist outside the HMO, Dr. Marcus Whitmore. After the May 27, 2009 referral, Dr. Whitmore fitted Koehler for the dental device on June 2, 2009. The bill for his services was $2,300. Aetna denied coverage for those charges, and Koehler pursued Aetna's internal appeals process.

At Koehler's request, Dr. Kakar wrote a letter to Aetna, dated February 10, 2010, in which he asked Aetna for a retroactive referral directing Koehler to Dr. Whitmore for the device fitting. Dr. Kakar stated that "[w]e were and are

2

## No. 11-10458

unaware of any Aetna Participating Provider as of May 27, 2009, who could have provided the device." Aetna upheld its initial decision denying Koelher's claim. Aetna cited the absence of pre-authorization for Dr. Whitmore's services, explaining in its denial letter that "services provided by nonparticipating providers require a referral from an Aetna contracted provider and a prior approval by Aetna Patient Management Department."[1]

Koehler filed suit in state court on April 20, 2010. She seeks to recover under 29 U.S.C. § 1132, which permits a plan beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" 29 U.S.C. § 1132(a)(1)(B). Aetna removed the case to federal court, and sought summary judgment on the ground that it "correctly denied Koehler's claim for benefits because the Plan excludes out-of-network services unless such services are pre-authorized."[2] The district court granted summary judgment for Aetna, and Koehler filed this appeal.

The parties agree that the relevant plan provisions are found in the plan's "Certificate of Coverage" ("COC"), which sets forth the plan's health insurance benefits. However, in addition to appearing in the plan, the COC's text also constitutes the "summary plan description" which ERISA requires plan administrators to provide to participants and beneficiaries.[3] Thus, although a

---

[1] The letter cites two other bases for denying the claim, but Aetna did not rely on these in its motion for summary judgment.

[2] Federal jurisdiction is based on 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

[3] Title 29, United States Code, § 1021(a)(1) requires that a plan administrator "shall cause to be furnished in accordance with section 1024(b) of [Title 29] to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan . . . a summary plan description described in section 1022(a)(1) . . . ." 29 U.S.C. § 1021(a)(1). Section 1024(b)(1) states that "[t]he administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description . . . ."

Aetna produced a copy of the COC in response to Koehler's request for a copy of "the

No. 11-10458

plan summary is a separate document from the plan itself, in this case the summary's text is simply a verbatim copy of the underlying plan provisions.[4] We now relate the provisions relevant to this case.

Before coverage begins, the COC requires an insured to select a participating provider to be his "**Primary Care Provider**," or "**PCP**."[5] The benefits scheme described in the COC contemplates that nearly all of an insured's medical care be provided by physicians in the HMO, at the direction of the insured's PCP. The plan does, however, provide limited coverage of services from outside providers. That coverage is addressed in Subsection H of the "HMO Procedure" section:

H.  Out-of-Network Services

If the **Member's PCP** is part of a practice group or association of **Health Professionals** and **Medically Necessary Covered Benefits** are not available within the **PCP**'s limited provider network, the **Member** has the right to a **Referral** to a **Participating Provider** outside the **PCP**'s limited provider network. If **Medically Necessary Covered Benefits** are not available from **Participating Providers**, **HMO** will allow a **Referral** to a non-participating **Provider**. The following apply:

1. The request must be from a **Participating Provider**.

---

summary plan description applicable to [her] claim." Also, Aetna concedes in its appellate brief that the regulations governing the writing and formatting of summary plan descriptions apply to the COC.

[4] Summary plan descriptions "provide communication with beneficiaries about the plan, but . . . do not themselves constitute the terms of the plan." *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011).

[5] Many terms in the COC are printed in bold typeface. The COC's introduction states that terms "appear[ing] in bold type with initial capital letters" have the meanings set forth in the COC's "Definitions" section. We note, however, that making sense of the COC's provisions sometimes requires disregarding that instruction. For example, Subsection H of the "HMO Procedure" section speaks of "a **Referral** to a non-participating **Provider**," which is a contradiction in terms if one applies the COC's definition of "**Referral**" as "[s]pecific directions or instructions . . . that direct a **Member** *to a Participating Provider* for **Medically Necessary** care" (emphasis added).

4

No. 11-10458

2. Reasonably requested documentation must be received by **HMO**.

3. Before **HMO** denies a **Referral**, a review will be conducted by a **Specialist** of the same or similar specialty as the type of **Provide**r to whom a **Referral** is requested.

4. The **Referral** will be provided within an appropriate time, not to exceed five business days, based on the circumstances and the **Member**'s condition.

5. The **Member** shall not be required to change his or her **PCP** or **Participating Specialist** to receive **Medically Necessary Covered Benefits** that are not available from **Participating Providers**.

6. **HMO** will reimburse the non-participating **Provider** at the usual and customary or an agreed upon rate, less the applicable **Copayment(s)**.[6]

A number of provisions in the COC address pre-authorization. On the COC's first page are the words "IN SOME CIRCUMSTANCES, CERTAIN MEDICAL SERVICES ARE NOT COVERED OR MAY REQUIRE PRE-AUTHORIZATION BY HMO." Subsection J of the "HMO Procedure" section is titled "Pre-Authorization." That subsection states, "Certain services and supplies under this **Certificate** may require pre-authorization by **HMO** to determine if they are **Covered Benefits** under this **Certificate**."

A separate section of the COC, titled "Medically Necessary Covered Benefits," includes several subsections devoted to particular categories of medical treatment. Several of these include explicit statements that the particular service requires pre-authorization. Notable among these provisions is language specifically requiring pre-authorization for services rendered pursuant to a standing referral to a specialist inside or outside of the HMO.[7]

---

[6] We will refer to this provision below simply as "Subsection H."

[7] The standing referral paragraph reads:

If a **Member** requires ongoing care from a **Specialist**, the **Member** may receive

No. 11-10458

Also notable is the specifically stated pre-authorization requirement for second opinions from outside providers.[8]   The parties agree, however, that Dr. Whitmore's services did not take the form of a second opinion and were not provided pursuant to a standing referral.

Subsection I of the COC's "General Provisions" section disavows liability for any service from a non-participating provider without "prior arrangements . . . made by **HMO**":

> Except in cases of **Medical Emergency** or **Urgent Care**, or as otherwise provided in this Certificate, services are available only from **Participating Providers**. **HMO** shall have no liability or obligation whatsoever on account of any service or benefit sought or received by a **Member** from any non-participating **Provider** or other person, entity, institution or organization unless prior arrangements are made by **HMO**.

Finally, language in the "Exclusions and Limitations" section states that covered benefits do not include "[u]nauthorized services, including any service obtained by or on behalf of a **Member** without a **Referral** issued by the **Member**'s **PCP** or pre-authorized by **HMO**."

## III. Discussion

---

a standing **Referral** to such **Specialist**. If **PCP** in consultation with an **HMO** Medical Director and an appropriate **Specialist** determines that a standing **Referral** is warranted, the **PCP** shall make the **Referral** to a **Specialist**. This standing **Referral** shall be pursuant to a treatment plan approved by the **HMO** Medical Director in consultation with the **PCP**, **Specialist**, and **Member**.

The term "**Specialist**" is defined as "[a] **Physician** who provides medical care in any generally accepted medical or surgical specialty or subspeciality."

[8] The second opinion paragraph reads:

**Member** may request a second opinion regarding a proposed surgery or course of treatment recommended by **Member's PCP** or a **Specialist**. Second opinions may be obtained on referral from the **Member's PCP**. Requests for second opinions from non-participating **Providers** must be pre-authorized.

## A.  Interpreting the COC

Because the plan gives Aetna discretion to interpret the plan's terms, we review Aetna's interpretation for abuse-of-discretion.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 957 (1989).  "The most important" factor in that analysis is "whether the administrator's interpretation is consistent with a fair reading of the plan . . . ."  *Gosselink v. American Tel., Inc.*, 272 F.3d 722, 727 (5th Cir. 2001).[9]  In interpreting an ERISA plan, we give its language the ordinary and generally accepted meaning.  *See Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634, 641 (5th Cir. 2004).

Koehler contends that Subsection H of the COC requires only that a doctor within the HMO send Aetna a request for ad hoc referral to an outside physician, and that the request can be made after the patient receives the services.  Aetna contends that the pre-authorization requirement is unambiguously expressed in Subsection H, Subsection I of the COC's "General Provisions" section, and the language in the "Exclusions and Limitations" section.

We find that the COC is ambiguous with respect to pre-authorization for outside services rendered on an ad hoc basis.  Subsection H seems to contemplate that at some point a participating provider will submit a request for Aetna to approve the outside referral.  But it does not state when that request must occur relative to the provision of services, and it does not state that failing to submit that request beforehand will irrevocably forfeit whatever coverage the insured would otherwise have enjoyed.  Considering other provisions in the

---

[9] Other factors often considered include any unanticipated costs resulting from different interpretations of the plan, the internal consistency of the plan under the administrator's interpretation, any relevant regulations formulated by the appropriate administrative agencies, and the factual background of the determination and any inferences of bad faith. *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 637-38 (5th Cir. 1992).  If the plan administrator both evaluates and pays claims, then courts also consider the administrator's conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111-12, 128 S. Ct. 2343, 2347-48 (2008).

No. 11-10458

COC, there are the statements on pages one and seven saying that some services may require "pre-authorization," and then in provisions for a number of services "pre-authorization" is expressly required, but *not* in Subsection H. As for the exclusion of services obtained "without a Referral issued by the Member's PCP or pre-authorized by HMO," that language at most requires that one of its two disjuncts be satisfied.

Then there is the sentence in Subsection I of the "General Provisions" section speaking of "prior arrangements . . . made by **HMO**" as a prerequisite for any services from an outside provider to be covered. That language does not unambiguously require pre-authorization in the sense of a claim-by-claim process for which the patient or his doctors would be responsible. "[P]rior arrangements" has a broader meaning than "pre-authorization," and while the latter term is repeatedly used to indicate a pre-authorization requirement elsewhere in the COC, "prior arrangements" is not. Also, Subsection I is in the "General Provisions" section, not the "HMO Procedure" section, where one would expect to find procedures applicable to services inside and outside the HMO. And the qualifying words ". . . made by **HMO**," suggests that the "prior arrangements" refer to some undertaking that Aetna would initiate, whereas pre-authorization would be initiated by the patient or her doctors in the HMO. Moreover, the "prior arrangements" language encompasses all outside services, including second opinions and outside services under a standing referral. The specific pre-authorization language in the provisions devoted to those services suggests that Subsection I's reference to "prior arrangements" has a different meaning, possibly referring to a one-time undertaking that Aetna wished to complete in the initial organization of the HMO before being obliged to process claims for services by outside providers.

Finally, there is the COC's assurance that Aetna "will not use any decision making process that operates to deny **Medically Necessary** care that is a

8

**Covered Benefit** . . . ." That promise seems to disavow relying on a harmless procedural lapse as a basis for refusing reimbursement for services that would otherwise be covered. An insured's receiving outside services without pre-authorization does not prejudice Aetna's ability to refuse coverage if it concludes that the services were not medically necessary or that they were in fact available within the HMO. Nor does making an after-the-fact determination prejudice Aetna's ability to refuse to pay more than a reasonable charge for the outside provider's services.

As noted above, the plan gives Aetna discretion to resolve ambiguities in the plan language in its favor. However, Aetna's discretion to resolve ambiguities in the *plan* does not extend to the plan *summary*, notwithstanding that in this instance the summary is a verbatim copy of text in the plan. *See Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 642 (5th Cir. 1999.[10] Ambiguities in a plan summary are resolved in favor of the beneficiary. *Id.* (holding that *contra proferentum* applies when interpreting a plan summary even "when the plan administrator has expressly been given discretion to interpret the plan"); *Hansen v. Continental Ins. Co.* 940 F.2d 971, 982 (5th Cir. 1991). That is because ERISA requires that plan summaries be "written in a manner calculated to be understood by the average plan participant, and . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a); *see also*, *e.g.*, *Harris Methodist Ft. Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 336 (5th Cir. 2005) (noting that plan summaries are interpreted from the perspective of a layperson). Therefore,

---

[10] *Cf. Hansen*, 940 F.2d at 982 (refusing to give effect to language in a plan summary stating that all rights are governed by the underlying plan, because that would "wholly undermine" the statutory "requirement of an accurate and comprehensive summary plan description.") The district court's reliance on *High v. E-Systems Inc.*, 459 F.3d 573 (5th Cir. 2006), is mistaken. That case did not concern a discrepancy between the administrator's interpretation of the plan and the terms of the plan summary. *Id.* at 576.

when considering the COC as a plan summary we must resolve its ambiguity against requiring pre-authorization of ad hoc outside services. That of course diverges from the interpretation Aetna has given to identical language in the underlying plan.[11] If that outcome seems puzzling, the anomaly is traceable to Aetna's curious decision to use identical language in both plan and plan summary–documents that serve quite different functions and are accordingly subject to differing interpretative standards. *See Hansen*, 940 F.2d at 981.

In *Hansen*, we held that the terms of the plan summary control over inconsistent terms in the underlying plan. 940 F.2d at 981. And in *Rhorer* we held that the employer/administrator's "interpretation of the plan [was] legally incorrect" because it conflicted with one possible interpretation of ambiguous language in the plan summary. 181 F.3d at 642. Those cases preceded *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), in which the Supreme Court held that the text of § 1132(a)(1)(B) does not authorize courts to enforce the terms of a plan summary, because that provision only authorizes enforcement of the "'terms of the plan.'"[12] Section 1132(a)(1)(B) does, however, allow courts to "look outside the plan's written language in deciding what those terms are, i.e., what the language means . . . ." *CIGNA*, 131 S Ct. at 1877. Also, even if the plan's language *un*ambiguously supports the administrator's decision, a beneficiary may still seek to hold the administrator to conflicting terms in the plan

---

[11] Typically, the plan summary is not a verbatim copy of the text of the plan itself. *See Hansen*, 940 F.2d at 981 ("[T]he very purpose of having a summary description of the policy is to enable the average participant in the plan to understand readily the general features of the policy, precisely so that the average participant need *not* become expert in each and every one of the requirements, provisos, conditions, and qualifications of the policy and its legal terminology.")

[12] *CIGNA*, 131 S. Ct. at 1877 (quoting 29 U.S.C. § 1132(a)(1)(B) (emphasis added in *CIGNA* removed)); *see also id.* at 1877-78.

No. 11-10458

summary through a breach-of-fiduciary-duty claim under § 1132(a)(3). *CIGNA*, 131 S. Ct. at 1878-82.[13]

Thus, *CIGNA* changes our case law to the extent that the plan text ultimately controls the administrator's obligations in a § 1132(a)(1)(B) action, but *CIGNA* does not disturb our prior holdings that (1) ambiguous plan language be given a meaning as close as possible to what is said in the plan summary, and (2) plan summaries be interpreted in light of the applicable statutes and regulations. *See McCall v. Burlington Northern/Santa Fe. Co.*, 237 F.3d 506, 512 (5th Cir. 2000); *Hansen*, 940 F.2d at 980-81; *Rhorer*, 181 F.3d at 641-42. Those regulations require considerably greater clarity than the COC provides.[14] For example, "restrictive plan provisions," like a pre-authorization requirement, "need not be disclosed . . . in close conjunction with the description or summary of benefits," but *only* if "adjacent to the benefit description the page on which the restrictions are described is noted." 29 C.F.R. § 2520.102-2(b).[15] The plan does

---

[13] Section 1132(a)(3) permits a beneficiary to seek equitable relief "(A) . . . enjoin[ing] any act or practice which violates any provision of [29 U.S.C. §§ 1001-1119c] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [29 U.S.C. §§ 1001-1119c] or the terms of the plan." Section 1132(a)(3) supplies a "catchall" or "safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S. Ct. 1065, 1078 (1996).

[14] *See, e.g.*, 29 C.F.R. § 2520.102-3(*l*)(2) (requiring that a plan summary "clearly identify[] circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, [or] reduction . . . ."); 29 C.F.R. § 2520.102-2(b) (requiring that the summary's format "not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries . . . ," and that "[a]ny description of exception[s], limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.")

[15] This regulation states in full:

> The format of the summary plan description must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries. Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the

## No. 11-10458

not preclude Aetna from requiring pre-authorization for ad hoc services from outside doctors in the future, so long as it provides a plan summary that expresses that requirement with the clarity that ERISA requires.[16] Aetna having failed to do that, we find that it has not given a fair reading to the plan.[17] We next consider the facts surrounding the denial of the claim and evidence of bad faith, *Rhorer*, 181 F.3d at 643, along with Aetna's conflict of interest as the entity that both evaluates and pays claims. *Glenn*, 554 U.S. at 115, 128 S. Ct. at 2347. The district court concluded that "[Koehler] does not allege any facts that would rise to the level of bad faith considered by *Rhorer*, or any level of bad faith for that matter."[18] We disagree.

In *Rhorer*, we found "some evidence, although slight, that the plan administrator had acted in bad faith" in refusing to pay optional life insurance

---

style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

[16] *See Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 933, 938 (5th Cir. 1993) (refusing to consider outdated summaries' unconditional promises of health benefits upon retirement, because plaintiffs retired over a year after their employer/plan-administrator had published a revised plan summary that accurately reflected its right to amend or terminate post-retirement benefits).

[17] *See Hansen*, 940 F.2d at 980 ("'It is grossly unfair to . . . disqualify [an employee] from benefits if . . . [the] conditions [which lead to the disqualification] were stated in a misleading or incomprehensible manner in the plan booklets.'" (quoting H.R.Rep. No. 93-533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4646) (bracketing added in *Hansen*)).

[18] The district court also observed that Dr. Whitmore's services may not have been medically necessary, and that they may in fact have been available within the HMO. But Aetna did not reach those questions in evaluating Koehler's claim, and courts reviewing an administrator's denial of benefits consider only the actual basis on which the administrator denied the claim, "not its post-hoc rationalization[s]." *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395-96 n.4 (5th Cir. 2006).

because the decedent had not returned to active, full-time employment in the period between his enrollment in the plan and his death. 181 F.2d at 643. The administrator had enrolled the decedent in the plan and accepted his premiums for the extra life insurance, all the while knowing that his declining health would not permit him to return to active employment. *Id.* at 638, 643. Also, the administrator subsequently sought to revoke the life insurance shortly before the decedent died. *Id.* at 643-44. "Though far from conclusive," we found that those circumstances "smack[ed] of bad faith" and precluded summary judgment for the administrator on the bad-faith factor. *Id.* at 644. Here, there is the inadequate summary and evidence that Aetna failed to apprise Dr. Rajak and Dr. Checo, Koehler's doctors in the HMO, that they should not refer patients to outside providers without requesting permission from Aetna beforehand. As in *Rhorer*, this does not conclusively establish bad faith. But it suggests a device to cause insureds to inadvertently forfeit coverage through ignorance of the correct procedures. Given Aetna's conflict of interest, it smacks of bad faith to invoke pre-authorization if that requirement is unknown to both doctors and patients in the HMO. *See Glenn*, 554 U.S. at 115, 128 S. Ct. at 2347.

We have held that Aetna relied on a legally incorrect interpretation of ambiguous plan language, and that Aetna violated ERISA regulations in providing an inadequate plan summary. We do not address what more, if anything, Koehler must show in order to establish that Aetna abused its discretion.[19] Though we also hold that there is some evidence of bad faith, we express no opinion on whether Koehler must demonstrate bad faith in order to recover. *See Jones v. SONAT, Civ. Master Emp. Ben. Plan. Admin. Cmte.*, 997 F.2d 113, 116 (5th Cir. 1993) (A denial based on a legally incorrect interpretation of a plan is an abuse of discretion if it benefits the plan fiduciary at the expense

---

[19] We note that there is no right to a jury trial in ERISA denial-of-benefits cases. *Calamia v. Spivey*, 632 F.2d 1235, 1236-37 (5th Cir. 1980).

of the beneficiary, unless the decision can be justified "in terms of greater benefit to the class of Plan participants and beneficiaries.")

## B. Exhaustion of Administrative Remedies

We also leave for consideration on remand Aetna's argument that Koehler had failed to exhaust her administrative remedies, which the district court did not reach in its summary judgment ruling.  We note, however, that under 29 C.F.R. § 2560.503-1(b), an ERISA benefit plan must "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations . . . ." Procedures cannot be considered reasonable unless they "do not contain any provision, and are not administered in a way, that unduly inhibits or hampers the initiation or processing of claims for benefits."  29 C.F.R. § 2560.503-1(b)(3). "In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of [29 C.F.R. § 2560.503-1] . . . a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under [29 U.S.C. § 1132(a)]. . . ."  It is difficult to see how Aetna's leaving both Koehler and her doctors ignorant of the pre-authorization requirement would not "inhibit or hamper[]" her from initiating the procedures necessary for her to realize her entitlements under the plan.

## IV. CONCLUSION

The district court's judgment is REVERSED and the case is REMANDED.

No. 11-10458

HAYNES, Circuit Judge, concurring in part:

I agree that the decision of the district court should be reversed. However, I have reviewed the provisions of the plan so carefully and thoroughly set forth in the majority opinion. Taken as a whole, I cannot read these provisions to require preauthorization for this particular circumstance as a condition precedent to any recovery regardless of any other circumstances. Thus, I conclude there is no ambiguity, and I would hold that the plan administrator abused its discretion in concluding to the contrary. However, other reasons were given for denial of benefits, so I concur in remanding for purposes of considering those issues.