CHIEF JUSTICE
  CAROLYN WRIGHT
JUSTICES
  JIM MOSELEY
  DAVID L. BRIDGES
  MICHAEL J. O'NEILL
  KERRY P. FITZGERALD
  MOLLY FRANCIS
  DOUGLAS S. LANG
  ELIZABETH LANG-MIERS
  MARY MURPHY
  ROBERT M. FILLMORE
  LANA MYERS
  DAVID EVANS
  DAVID LEWIS



**Court of Appeals**
**Fifth District of Texas at Dallas**
600 COMMERCE STREET, SUITE 200
DALLAS, TEXAS 75202
(214) 712-3400

LISA MATZ
CLERK OF THE COURT
(214) 712-3450
lisa.matz@5th.txcourts.gov

GAYLE HUMPA
BUSINESS ADMINISTRATOR
(214) 712-3434
gayle.humpa@5th.txcourts.gov

FACSIMILE
(214) 745-1083

INTERNET
HTTP://5TH.TXCOURTS.GOV

July 3, 2013

James L. Johnson
The Johnson Law Firm
6500 Greenville Ave., Suite 345
Dallas, TX 75206-1018

Linda G. Moore
Taber Estes Thorne & Carr, PLLC
3500 Maple Suite 1100
Dallas, TX 75209

Re: **Joann Phillips V. Metropolitan Life Insurance Company & The Verizon Employee Benefits Committee; 05-11-00678-CV**

Dear Attorneys:

Enclosed is a corrected page for the above-mentioned case. Please note the following typographical errors, which have been corrected:

Page 4, Footnote 4

Please replace page four of your previous copy with the enclosed.

Sincerely,

Lisa Matz
Clerk of the Court

cc:     Trial court judge
        Trial court clerk

**AFFIRM; and Opinion Filed May 10, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-11-00678-CV

### JOANN PHILLIPS, Appellant

### V.

### METROPOLITAN LIFE INSURANCE COMPANY AND THE VERIZON EMPLOYEE BENEFITS COMMITTEE, Appellees

**On Appeal from the County Court at Law No. 2**
**Dallas County, Texas**
**Trial Court Cause No. CC-10-06957-B**

## OPINION

Before Justices Francis and Murphy[1]
Opinion by Justice Murphy

JoAnn Phillips appeals from a summary judgment rendered in favor of Metropolitan

Life Insurance Company and The Verizon Employee Benefits Committee (VEBC) on her claim

that MetLife, acting on behalf of VEBC, improperly withheld long-term disability benefits to

which she was entitled. We affirm.

### I. BACKGROUND

During her employment as a benefit specialist with a subsidiary of Verizon

Communications, Inc., Phillips participated in an employee welfare benefit plan (the Plan)

---

[1]The Honorable Joseph Morris was on the panel and participated at the submission of this case. Due to his retirement from this Court on December 31, 2012, he did not participate in the issuance of this Opinion. *See* TEX. R. APP. P. 41.1(a), (b).

governed by the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C.A. §§ 1001–1461. VEBC is the Plan administrator; MetLife is the Plan's claims administrator.

Phillips suffered from various health conditions. In April 2002, Verizon approved her request for an accommodation under the Americans with Disabilities Act to transition to a twenty-hour work week. Phillips ultimately stopped working in 2007 and became eligible for disability benefits under the Plan. Her date of disability is February 16, 2007. After receiving fifty-two weeks of short-term disability benefits, Phillips applied for and began receiving LTD benefits in 2008. Although the parties agree that Phillips is disabled and thus entitled to benefits, they disagree about the amount of monthly benefits due.

## A. The Plan

LTD claims under the Plan are paid from the Verizon Long Term Disability Trust for Active Employees, which is funded with employee contributions. MetLife, as the claims administrator, received a fee to process disability claims and had the authority to make final determinations regarding eligibility and benefit claims. The Verizon summary plan description (SPD)[2] provided to Phillips specifically identifies MetLife's authority as including discretion to (1) interpret the disability income program based on "provisions and applicable law and make factual determinations about claims," (2) determine eligibility for benefits, (3) decide "the amount, form and timing of benefits," and (4) resolve "any other matter" under the program raised by a participant or beneficiary or identified by the claims administrator. The SPD also provides that "[i]n case of an appeal, the claims administrators' decisions are final and binding

---

[2] The parties disagree about which SPD is applicable to Phillips's LTD claim. Appellees assert the SPD in effect for the 2007 Plan Year governs because Phillips first became disabled in 2007. Phillips, on the other hand, asserts the SPD in effect for the 2008 Plan Year, which she claims amended the 2007 SPD, governs because her eligibility for LTD benefits began in 2008. Both SPDs are in the record before us, and based on our review of the documents, there is no material difference in the provisions relevant to the issues presented in this appeal. Therefore, we need not determine which SPD governs Phillips's claim. Any language quoted in this opinion appears in both SPDs.

on all parties to the full extent permitted under applicable law," unless the participant or beneficiary later proves the "decision was an abuse of administrator discretion."

The SPD describes the details related to a participant's disability coverage, but it advises that the person's health and well-being benefits, such as disability coverage, are governed by the official plan document, labeled "The Plan for Group Insurance." Both the SPD and the Plan expressly incorporate the SPD by reference into the Plan as "the source of specific information relating to [a participant's] disability benefits."[3]

### B. LTD Benefit Calculation

According to the SPD, Phillips's LTD benefit calculation is based on her "annual benefits compensation" and the LTD coverage option she was enrolled in at that time. The figure used for Phillips's "annual benefits compensation" is determined "at the time [she] first became totally disabled" under the short-term disability plan and is made up of the following amounts as of July 1 of the previous calendar year:

- Base pay, including any temporary increases.

- Short-term incentives, such as Verizon Incentive Plan awards.

- Commissions (based on a rolling 12-month period, beginning July 1).

- Foreign service premiums.

Overtime pay, discretionary awards, sales draws, and bonuses are excluded from annual benefits compensation. The SPD defines "pay" as a participant's "annual base salary," which does not include overtime pay, incentives, or "[a]ny other element of compensation other than base recurring salary."

---

[3] The Plan does not appear to be part of the administrative record. Appellees submitted the Plan as part of the proceedings in the trial court.

Phillips's "monthly unreduced LTD benefit" is calculated by dividing her "annual benefits compensation by 12 to arrive at [her] monthly benefits compensation amount." That amount is then multiplied by Phillips's benefit level, which was 50%. The monthly LTD benefit amount also is reduced by benefits provided from "[o]ther sources of disability income," such as social security disability income and "[p]ension benefits from a Verizon pension plan, if [Phillips] elect[s] to receive them." If the monthly LTD benefit is reduced by other sources of disability income, the monthly benefit "will not be reduced below whichever of these is greater": 10% of her unreduced monthly LTD benefit or $100. But this minimum monthly benefit amount does not apply if the participant receives an overpayment of benefits.

## C. Phillips's Claim for LTD Benefits

MetLife approved Phillips's claim for LTD benefits by letter dated September 30, 2008. For the period beginning February 15, 2008 (the date she became eligible for LTD benefits) through December 31, 2009, Phillips was paid LTD benefits based on an annual benefits compensation figure of $47,400, for an unreduced LTD benefit of $1,975.00 per month.[4] That monthly benefit also was reduced by Phillips's social security disability income. On December 2, 2008, MetLife wrote to Phillips that it had reduced her monthly benefit by an additional amount of $760.25 per month based on her receipt of pension benefits effective November 2008. After the second reduction, her LTD benefit was $197.50 per month, which was the minimum monthly benefit amount under the Plan (10% of her unreduced monthly LTD benefit).

The reduction in Phillips's monthly LTD benefit based on pension benefits followed her certification, signed November 17, 2008, that she had "elected the Lump Sum option from the Verizon Management Pension Plan to commence on November 1, 2008." This "payment

---

[4] $47,400 (annual benefits compensation) $\div$ 12 (months) $\times$ 50% (Phillips's coverage level) = $1,975.00 (unreduced monthly LTD benefit).

option" paid $160,963.40. That same day, her spouse also signed a consent form in which he certified his consent "to [his] spouse's election to begin benefits now."

When she elected the lump sum option, Phillips chose to roll over her pension benefits into a traditional IRA. And in accordance with her election, the Verizon benefits center sent Phillips a check payable to ING Bank for deposit into the "IRA OF JOANN H PHILLIPS." The check stub described the payment amount as a "CASH DISTRIBUTION." Phillips signed an IRA deposit form, indicating she was enclosing a check for deposit; the "deposit type" was for "Employer Plan to IRA Rollover."

On January 8, 2010, MetLife informed Phillips by letter that her salary from which the annual benefits compensation was derived was "incorrectly reported" and the correct unreduced benefit payable was $1,402.08 per month, not $1,975.00 per month. This corrected amount was based on an annual benefits compensation figure of $33,650. MetLife adjusted Phillips's LTD claim to reflect the correct benefit amount, which included reductions for her social security disability income and pension benefits, and informed Phillips the correction resulted in an overpayment of her claim. Responding to Phillips's request for more information, MetLife sent Phillips another letter dated April 2, 2010, in which it explained that Phillips's "correct yearly pre-disability earnings were $33,650" and that her LTD benefit paid from February 2008 through December 31, 2009 on an annual benefits compensation figure of $47,400 resulted in an overpayment. MetLife further informed Phillips by a May 14, 2010 letter that the pre-disability earnings "used to calculate her monthly benefit amount" were provided by Verizon.

In the April 2010 letter, MetLife also addressed the additional offset to Phillips's LTD benefit based on her pension benefits. MetLife stated that in November 2008, it had received information from Phillips's employer indicating that she "had commenced her pension benefits

and elected to take the payment in a lump sum amount of $160,963.40 with a monthly equivalent amount of $760.25." It explained that although the lump sum amount was rolled over into an IRA, her employer confirmed that the rollover was "considered an offset to her monthly LTD benefit" amount as indicated in the Plan.

Phillips appealed MetLife's determination of her benefits in July 2010, contending MetLife made egregious errors in reducing her monthly LTD benefit based on a "miscalculation of her annual benefits compensation" and "an improper offset for pension benefits she ha[d] not received." She sought $4,390.15 in underpaid LTD benefits through June 2010 because of "various miscalculations by MetLife."

Regarding her contention MetLife miscalculated her annual benefits compensation, Phillips attached check stubs for the relevant period for determining her annual benefits compensation, which the parties agree is July 1, 2005 through June 30, 2006 based on her disability date of February 16, 2007. The check stubs reflected a consistent amount for the "cycle rate" and differing amounts as "basic wages." Phillips explained that during the relevant period, she did not work a straight twenty-hour week or receive the same pay for each week. She asserted she was entitled to a monthly LTD benefit based on her "basic wages" plus incentive awards, for an annual benefits compensation amount of $46,037.75. Phillips claimed MetLife "utterly failed to explain the basis for its statement that Ms. Phillips'[s] 'correct yearly pre-disability earnings were $33,650.00'" and failed to connect the figure with the language of the SPD.

Regarding her contention MetLife improperly offset pension benefits from her LTD benefit, Phillips attached excerpts from the SPD related to pension benefits, her Verizon pension election form, a copy of the lump sum check Verizon issued to Phillips's bank for deposit into

her IRA, an IRA deposit form, and other documents showing she rolled over her pension lump sum from her employer's plan to a traditional IRA. Phillips asserted this reduction was improper because she had not "received" any pension benefits from the pension plan as required before the benefits may be offset. Rather, the bank (not Phillips) "received" the funds. Phillips claimed MetLife did not apply the terms of the SPD and "instead expressly relied on what 'is considered' by 'her employer' to constitute an offset."

MetLife communicated its denial of Phillips's administrative appeal by letter dated August 26, 2010. In upholding its original determination of her monthly benefit amount, MetLife first explained that Phillips's employer is the entity "responsible for calculating" her salary for purposes of determining her annual benefits compensation figure and for "supplying this information to MetLife so that monthly disability benefit amounts can be determined." MetLife stated her employer confirmed that her salary on her last day worked was $33,650 and that this amount included "any commissions and VIP awards" she received "based on the rolling twelve month period beginning July 1, 2005." MetLife advised Phillips that she should contact her department supervisor if she did not agree with the salary information provided by her employer.

MetLife then addressed the offset to her monthly LTD benefit based on her pension benefits. MetLife stated Phillips "elected to receive her pension from her employer" and that the Plan "does not stipulate that pensions rolled over into a traditional IRA would be exempt from being considered as other sources of disability income as defined by the Plan." MetLife concluded the original determination for her monthly benefit amount using an annual benefits compensation of $33,650 and including an offset for pension benefits was appropriate.

### D. This Lawsuit

Phillips appealed that determination by filing her trial court petition to recover benefits due under the Plan. *See* 29 U.S.C.A. § 1132(a)(1)(B) (permitting plan participant to bring civil action to recover benefits, enforce rights under plan terms, or clarify future benefits rights). She specifically sought payment of $5,599.87 in unpaid LTD benefits through September 2010. She also claimed her LTD benefits continue to accrue at a rate of $403.24 per month, which she alleged was the proper monthly benefit amount based on her annual benefits compensation amount of $46,037.75 and including a reduction for social security disability income (but no reduction for pension benefits because she did not receive them).

Based on the administrative claim record before the trial court, Phillips filed a motion for summary judgment. She supported her motion with excerpts from the administrative record, which included portions of the 2008 SPD and her check stubs for the relevant period; she also attached a service agreement between MetLife and Verizon that she obtained in discovery. Appellees responded and included a joint cross-motion for summary judgment. The cross-motion was supported by the 2007 SPD and excerpts from the administrative record, which included a "Print Claim Activity" log and screen shots of Phillips's pay history from Verizon. They also supported the cross-motion with two affidavits with attachments and a print-out of the definition of "receive" from the Webster's Online Dictionary. Phillips filed objections to appellees' summary-judgment evidence, objecting to the 2007 SPD and portions of the two affidavits. She also objected to certain attachments to the affidavits because they were not included in the administrative record.

The trial court granted appellees' cross-motion for summary judgment and denied Phillips's motion; it signed a final judgment on May 20, 2011, dismissing Phillips's claims with

prejudice.  Thereafter, Phillips filed a motion for new trial in which she complained of the court's refusal to rule on her objections to appellees' summary-judgment evidence.  She also filed an amended motion for new trial, arguing the trial court should vacate its order and final judgment because of a recently-issued United States Supreme Court decision, which she claimed rejected two of the central arguments raised by appellees in their cross-motion.  On July 8, 2011, the trial court signed one order overruling each objection Phillips raised as to appellees' summary-judgment evidence and another order denying Phillips's amended motion for new trial.

## II.  DISCUSSION

Phillips presents three issues on appeal.  In her first two issues, she contends the trial court erred in granting summary judgment, upholding the determination of her monthly LTD benefit amount, because (1) the figure used for her annual benefits compensation had no rational connection to the evidence in the record and (2) the offset to her monthly LTD amount based on pension benefits she did not receive was improper.  Phillips argues in her third issue that the trial court erred by overruling her objections to appellees' summary-judgment evidence.

### A.  Summary-Judgment Standard of Review

The parties filed traditional motions for summary judgment, and we apply standard summary-judgment rules in ERISA cases.  *See Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 566 (5th Cir. 2012); *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651 (5th Cir. 2009); *see also Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201–02 (5th Cir. 1997) (noting that "summary judgment is an appropriate procedural vehicle for the administrator to use in obtaining a resolution of the plan beneficiary's suit; [o]nce the motion for summary judgment is filed, the

usual summary judgment rules control.").[5]  Under those rules, we review de novo the trial court's

summary judgment.  *Mid-Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007);

*Beesley v. Hydrocarbon Separation, Inc.*, 358 S.W.3d 415, 418 (Tex. App.—Dallas 2012, no

pet.).  The movant has the burden of showing that no genuine issue of material fact exists and

that it is entitled to judgment as a matter of law.  *Beesley*, 358 S.W.3d at 418.

### B.  Legal Standards for Reviewing ERISA Benefit Determinations

We also review de novo the trial court's application of the appropriate standards of

review to be applied to an ERISA administrator's benefits determinations.  *Atkins*, 694 F.3d at

566 (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir.

1999)); *Lynd v. Reliance Standard Life Ins. Co.*, 94 F.3d 979, 980–81 (5th Cir. 1996) (question

of whether trial court employed appropriate standard in reviewing ERISA plan administrator's

eligibility determination is one of law reviewed de novo).  The standard of review for an ERISA

benefits determination is dependent upon the language of the controlling plan.  In ERISA cases,

an administrator's interpretation or application of the plan is reviewed using a de novo standard

of review unless the benefit plan expressly gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the plan's terms.  *Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan language grants an administrator

such discretionary authority, we review the administrator's determinations for an abuse of

discretion.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Firestone*, 489 U.S. at 115;

---

[5] *Cf. LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (describing summary judgment as mere "vehicle for deciding the case" and "non-moving party is not entitled to the usual inferences in its favor") (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)); *Day v. AT&T Disability Income Plan*, 733 F. Supp. 2d 1109, 1112 (N.D. Cal. 2010) (summary-judgment motion is "'merely the conduit to bring the legal question before the district court'" where ERISA abuse of discretion standard applies and "'the usual tests of summary judgment, such as whether a genuine dispute of material facts exists, do not apply'") (quoting *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009)).  The parties here do not suggest a fact dispute exists precluding summary judgment or that a different summary-judgment standard of review exists.

- 10 -

*Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 548 (Tex. 1991) (op. on reh'g) (observing *Firestone* resolved review standards where administrator maintains discretion).

The abuse of discretion standard in the ERISA context "is synonymous with arbitrary and capricious review." *Cooper*, 592 F.3d at 652. Under this standard, the plan administrator's decision must be supported by "substantial evidence." *Atkins*, 694 F.3d at 566 (citing *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)). Substantial evidence is "'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)). A decision is arbitrary if it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust Fin. Servs.*, 168 F.3d at 215. Our review of the administrator's decision is not complex or technical; we must assure the decision "fall[s] somewhere on a continuum of reasonableness—even if on the low end." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir, 2007) (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999) (en banc), *overruled on other grounds by Glenn*, 554 U.S. at 105).

Under an abuse of discretion standard, our review of the plan administrator's determinations is limited to the administrative record. *See LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 841 (5th Cir. 2013); *see also Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 215 F.3d 516, 521 (5th Cir. 2000) (noting certain limited exceptions exist for trial court to stray from administrative record, such as "admission of evidence related to how an administrator has interpreted terms of the plan on other instances"); *Meditrust Fin. Servs.*, 168 F.3d at 215 (review confined to record available to administrator).

We may "consider only the actual basis on which the administrator denied the claim"; we may not consider "'post-hoc rationalization[s].'" *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 190 n.18 (5th Cir. 2012) (quoting *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395–96 n.4 (5th Cir. 2006)). Standard evidentiary rules do not apply to the claim administrator's benefits determinations; in assessing the reasonableness of the administrator's decision, we review the entire administrative record, including hearsay evidence relied on by the administrator. *See, e.g.*, *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 622 n.4 (7th Cir. 2008) (because plan administrator not a court of law, administrator not bound by rules of evidence); *Bressmer v. Fed. Express Corp.*, 213 F.3d 625, 625 (2d Cir. 2000) (same).

A two-step process applies to our review of a plan administrator's interpretation of a plan's terms. *See Ellis*, 394 F.3d at 269–70; *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637–38 (5th Cir.), *modified*, 979 F.2d 1013 (1992); *see also Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 539 (5th Cir. 2012) (per curiam). In the first step, a court determines the legally correct interpretation of the plan. *Ellis*, 394 F.3d at 269; *Gosselink v. Am. Tel. & Tel., Inc.*, 272 F.3d 722, 726 (5th Cir. 2001). To determine if the administrator's interpretation was legally sound, we consider: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Ellis*, 394 F.3d at 270 (citing *Wildbur*, 974 F.2d at 637–38); *see also Koehler*, 683 F.3d at 187 (noting "most important factor" in the analysis is "whether the administrator's interpretation is consistent with a fair reading of the plan") (internal quotations omitted). If that analysis results in the conclusion the administrator used a legally correct interpretation, there is no abuse of discretion and our inquiry ends. *Ellis*, 394 F.3d at 270. But if the administrator's interpretation is legally incorrect, we proceed to the

second step and determine whether the administrator's incorrect interpretation was an abuse of discretion. *Wildbur*, 974 F.2d at 638. Three factors are important to that analysis—the internal consistency of the plan under the administrator's interpretation, any relevant regulations, and the factual background of the determination and any inferences of lack of good faith. *Id.* Alternatively, we may also bypass the first step if we can determine the decision was not an abuse of discretion. *See High v. E-Systems Inc.*, 459 F.3d 573, 577 (5th Cir. 2006).

Finally, the degree of deference we afford an administrator's decision depends on the extent to which a claimant substantiates her claim with evidence of a conflict of interest. *See Glenn*, 554 U.S. at 115. The Supreme Court instructs that where a plan administrator both evaluates claims for benefits and pays benefit claims, the administrator is operating under a conflict of interest. *See id.* at 112. We must take that conflict into consideration and weigh it as a factor in determining whether the administrator abused its discretion. *See id.* at 115–17 (discussing *Firestone*, 489 U.S. at 115); *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (per curiam).

### C. Analysis

The parties do not dispute that MetLife had discretionary authority to review and decide Phillips's benefits claims, including the discretion to make factual determinations about claims and interpret the Plan. Therefore, the trial court and this Court on de novo review consider MetLife's determinations regarding Phillips's claims for an abuse of discretion. *See Atkins*, 694 F.3d at 566. Stated another way, we consider whether MetLife's decisions were reasonable in light of the record compiled during the administrative proceedings. A trial court properly grants summary judgment in favor of an administrator if there is no triable issue of fact as to whether the administrator abused its discretion.

### 1.  MetLife's Determination of Phillips's Annual Benefits Compensation

Phillips's first issue relates to a dispute over the amount of her annual benefits compensation.  She argues MetLife abused its discretion in determining her annual benefits compensation was $33,650 because this figure has no rational connection to the evidence in the administrative record.

The figure used for a participant's annual benefits compensation is the first part of the calculation for determining the person's monthly unreduced LTD benefit.  The SPD instructs MetLife to determine Phillips's annual benefits compensation at the time she first became totally disabled; the figure is made up of her "base pay" plus any short-term incentive awards, commissions, or foreign service premiums paid to her during the calendar year beginning July 1 preceding her total disability (in this case, the period beginning July 1, 2005 and ending June 30, 2006).  The SPD also lists certain paid elements that are not included in "annual benefits compensation," such as overtime pay, discretionary awards, sales draws, and bonuses.  A participant's "pay" is her "annual base salary."[6]  It does not include overtime pay, incentives, or "[a]ny other element of compensation other than base recurring salary."

Appellees assert the figure used for Phillips's annual benefits compensation was based on information electronically accessed from Phillips's file on the Verizon computer system as evidenced by printouts of computer screen shots contained in the administrative record.  The screen shots show the contents of inquiries related to Phillips's pay rate history and LTD coverage from her electronic records.  The first screen shot provides multiple line items related to Phillips's pay rate history as of February 16, 2007, Phillips's disability date.  One line item,

---

[6]We reject Phillips's contentions that the definition of "pay" relates only to the calculation of short-term disability benefits and that applying the definition of "pay" to the LTD calculation would violate ERISA regulations.  The term "pay" is specifically listed in the "Disability terms to know" section of the SPD.  There is nothing in the definition to suggest the term applies to STD benefits only.

labeled "ABC Frozen Pay," indicates Phillips's annual rate for the year 2007 was $33,650.[7] Other line items show an annual figure of $47,400 for purposes of Phillips's "Life Frozen Pay" and supplemental life and AD&D; the line item for "Life Frozen Pay" appears directly below the figure for "ABC Frozen Pay." Another screen shot shows her LTD coverage detail as "-50% of Pay." An additional screen shot shows a list of Phillips's ABC Frozen Pay rates for each year starting in 2001 and continuing through 2008.[8] Again, the rate for her 2007 ABC Frozen Pay was listed as $33,650.

MetLife also verified this figure with an employee in Verizon's benefits center during Phillips's administrative appeal. The employee confirmed by e-mail that Phillips's "annual benefits compensation as of 2/15/07 [was] $33,650.00." The parties agree Phillips earned an incentive award in the amount of $5,000 during the period, which Verizon confirmed was included in the figure.

Phillips agrees the figure of $33,650 appears in the administrative record but complains there is no evidence of who made the calculation or how it was calculated. She characterizes her complaint as "a dispute over the evidence that demonstrates [her] annual benefits compensation" and contends the figure that MetLife "read off a computer screen" and "verified" with a Verizon employee has no rational connection to the evidence because it was not calculated from actual data. She further contends the figure was a misstatement because it was based on what she calls a conclusory lay opinion on "some unknown person's calculation."

---

[7] The "Disability terms to know" section of the 2008 SPD provides an example of how the annual benefits compensation figure is determined. The example specifically notes that a participant's annual benefits compensation or "ABC" is the "[d]ollar amount frozen on 7/1 of the calendar year preceding [the participant's] total disability." It also states that the "ABC date always refers to the calendar year preceding the STD date. The ABC date and STD date are never in the same calendar year."

[8] According to the SPD, a participant's contributions for coverage are based on the person's annual benefits compensation as of July 1 of the previous calendar year and the LTD coverage option chosen.

Phillips maintains the "correct figure" for her annual benefits compensation is $46,037.75, which she claims includes the amounts she was actually paid "down to the penny" from July 1, 2005 through June 30, 2006 as shown on her Verizon check stubs. She argues the check stubs she provided as proof are the "only evidence" that demonstrates the proper amount and that MetLife "deliberately ignored" the content of her uncontroverted evidence.

It is evident by looking to the check stubs that Phillips calculated the figure of $46,037.75 by adding the "Total Pay" for each check stub she provided as part of her administrative appeal. "Total Pay," which is part of the "Check Summary" on each stub, is the sum of the categories listed under the "PAYMENTS" heading. The categories of payments under that heading vary from check to check and include such things as "Basic Wages," holiday pay, vacation pay, "Excused Day Off," "Short Sickness," "Equivalent Time Off," and "Other Paid Absence." The categories show what Phillips was paid for in each pay period. For example, her "VIP Award" of $5,000 was listed under that heading on the check stub for the pay period ending March 11, 2006. Many of the stubs also reflect that certain categories (including "Basic Wages") were adjusted for the prior period.

Phillips maintains the undisputed evidence of the "base pay" component of her annual benefits compensation is reflected in her "Basic Wages" as "specifically denoted" under the "Payments" heading on each stub. And she claims that her calculation using the actual data on her check stubs shows what she was actually paid "in the form of base pay and VIP awards" for the relevant period. Yet her calculation for what she maintains is the "correct figure" includes more than just "Basic Wages" and the $5,000 incentive award. It includes her "total pay"— everything else she was paid without reference to how these elements of compensation are part

of her "base pay." According to the SPD, "pay" does not include "[a]ny other element of compensation other than base recurring salary."

Additionally, Phillips's calculation assumes that although her work week was a twenty-hour work week, her base pay would also include the hours she worked over twenty hours. The "Basic Wages" component of her check appears to be calculated by multiplying the hourly rate listed on the check stub by the number of actual "Hours Worked." Phillips agrees she transitioned to a twenty-hour work week in 2002 but states her hours and pay fluctuated from week to week during the relevant period as evidenced by her check stubs. Notably, "pay" is not defined as what Phillips was actually paid; rather, "pay" is defined in terms of the salary Phillips was regularly paid, that is, her "*base recurring salary*" minus overtime pay and any other element of compensation. (Emphasis added). Whether the number of hours worked over twenty hours is classified as overtime pay or as extra hours for which Phillips was paid is irrelevant.[9] Likewise, "annual benefits compensation" is not defined in the SPD as the sum of everything paid to a claimant during the relevant period. It is made up of "base pay" plus a limited number of other elements paid to a claimant during the relevant period.

There appears to be no dispute among the parties about the validity of the check stubs in the administrative record. Nor is there a dispute about the time period they cover. Phillips's assertions related to the evidence suggest that because MetLife determined her annual benefits compensation to be a different amount (which it supported with printouts of computer-generated pay rate information and verification from Phillips's employer) that the content of her evidence

---

[9] We are not persuaded by Phillips's assertions that "Basic Wages" qualify as "recurring" because "Phillips was paid on a regular basis every two weeks" and that there "is no evidence to demonstrate that only the first 20 hours could be considered 'recurring.'" Although Phillips states her "Basic Wages" reflect what she was actually paid for her hours worked, which varied from check to check, she agrees she transitioned to a twenty-hour work week. As explained below, other components of the check stubs are consistent with being paid based on a twenty-hour work week.

- 17 -

was ignored. Her arguments also assume that the "raw data" from the stubs could not be used to calculate a different result. She presents no evidence, however, to suggest that either MetLife or Verizon failed to consider the content of her check stubs during the administrative proceedings. Consequently, Phillips's contention that MetLife's calculation was an abuse of its discretion because MetLife ignored her evidence is without merit.

Contrary to Phillips's assertions, the data from the check stubs support MetLife's determination for her annual benefits compensation. According to appellees, Phillips's base rate of pay is reflected in her "cycle rate," a figure that appears on both the pay rate history screen shot and on each check stub. Specifically, the screen shot reports a cycle rate of $1,101.92 as of March 26, 2006, which was paid on a bi-weekly basis. On the check stubs, Phillips's cycle rate was first reported as $1,053.85 and then increased to $1,101.92, as reflected on her check stub for the period ending April 8, 2006.[10] The check stubs also reflect that Phillips was paid every two weeks. Taking the screen shot's stated bi-weekly cycle rate of $1,101.92 as evidence of her base pay in the relevant period and multiplying it by twenty-six weeks, the amount is $28,649.92. Adding in Phillips's $5,000 incentive award, the amount is $33,649.92, or $33,650 rounded up, which is the figure MetLife used to calculate her monthly LTD benefit amount.

Phillips argues that because a "cycle rate" argument was not raised in MetLife's original written notice of its determination or in the letter denying her administrative appeal, appellees cannot use the "cycle rate" as support for its decision in this Court. Alternatively, she maintains there is "no evidence of what the 'Cycle Rate' represents." In reviewing whether the determination of Phillips's annual benefits compensation was reasonable, however, we look to

---

[10]Phillips's hourly rate of pay is reported on the check stubs just below the cycle rate. In conjunction with the change in cycle rate listed on the stubs, her hourly rate was first reported as $26.35 and increased to $27.55. Dividing the cycle rate by the hourly rate listed, it is 39.99 or 40 hours. Payment for forty hours on a bi-weekly schedule is consistent with Phillips's scheduled twenty-hour work week.

all the evidence compiled during the administrative proceedings. *See Corry*, 499 F.3d at 401–02. The check stubs (as well as the screen shot showing Phillips's pay rate history) are in the administrative record, and what the cycle rate represents can be calculated based on known facts, specifically, facts showing that (1) Phillips was paid on a bi-weekly basis; (2) she received a set hourly rate as shown on the check stubs; and (3) she transitioned to a twenty-hour work week. We do not construe appellees' explanation in its brief regarding the cycle rate as providing a new reason to support its determination of the figure for Phillips's annual benefits compensation. Rather, the explanation was in response to Phillips's contention that MetLife did not contest the validity of her check stubs. Appellees referenced the cycle rate and argued the check stubs "actually support MetLife's ABC determination in that they demonstrate MetLife used the correct ABC figure to calculate Phillips's LTD benefit payment."

Finally, Phillips asserts Verizon and VEBC's conflict of interest should be weighed as a factor against appellees. Citing the Administrative Services Agreement between MetLife and Verizon (as contracting agent for VEBC), Phillips contends Verizon and VEBC operate under a conflict of interest because they will be liable for the full amount of any LTD benefits awarded. She also contends MetLife's delegated fiduciary responsibility to make claim determinations was "expressly subject to Verizon's obligation in the services agreement to 'provide MetLife with information and documents necessary' for MetLife to conduct the administrative appeal." She claims Verizon "leveraged its conflict of interest to force underpayment of [her] LTD benefits" when it failed to provide MetLife with the necessary information and documents and instead provided an unsubstantiated figure that underreported Phillips's annual benefits compensation. She further suggests MetLife's reliance on the figure of $33,650 provided by Verizon demonstrates procedural irregularities and states that MetLife's disregard for her evidence is

"incredibly sloppy claims handling," constituting, at worst, overt bias as a result of Verizon's conflict.

The provision of the services agreement Phillips cites for Verizon and VEBC's conflict pertains to benefits awarded "as a result of Plan Benefits Litigation." That is, as between MetLife and Verizon, the parties agreed that Verizon would be liable for plan benefits and other amounts recovered by a plaintiff in the event of litigation involving those benefits. And while the services agreement states Verizon has an obligation to provide MetLife with information and documents within its control necessary to facilitate a full and fair review of a claim on appeal, the agreement specifically indicates MetLife assumed the responsibility and discretionary authority for approving or denying plan benefits. The SPD also states that final authority to determine claims was specifically delegated to a claims administrator. Despite Phillips's contentions, these provisions do not make it "financially advantageous" for Verizon to underreport her salary in an effort to retain the amount she alleged was underpaid. Further, Phillips presented no evidence showing that Verizon attempted to influence MetLife's decision on the amount of Phillips's annual benefits compensation. MetLife's request to Verizon to verify Phillips's annual benefits compensation also does not show Verizon had an influence over MetLife's determination of LTD benefits due Phillips. Her complaint is that the figure provided by Verizon deemphasized her "uncontroverted" evidence that supported a different calculation.

For ERISA purposes, a conflict of interest exists when a plan administrator both evaluates claims for benefits and pays benefits. *See Glenn*, 554 U.S. at 112. The Supreme Court has held that this conflict should be taken into consideration in determining whether the administrator abused its discretion. *See id.* at 115. A conflict that leads to the setting aside of a discretionary decision may be evidenced by a combination of "serious concerns" arising from the

- 20 -

plan administrator's financial conflict of interest. *Id.* at 118. Those circumstances are absent here. Although MetLife makes claim determinations, a claimant's benefits are paid from a trust that is funded by employee contributions, not by MetLife or VEBC. Thus, neither MetLife nor VEBC was in a position to benefit financially from decisions made with respect to a person's LTD benefits. MetLife simply receives a fee for its services paid for with funds from the trust.

Phillips's characterization of her issue as a dispute over the evidence that demonstrates her annual benefits compensation, in essence, is that the balance of the evidence in the administrative record—specifically, her Verizon check stubs—favors her calculation. Our focus in determining whether there was an abuse of discretion, however, is whether substantial evidence, which is more than a scintilla, supports MetLife's decision, not that substantial evidence supports Phillips's calculation. *See Ellis*, 394 F.3d at 273 ("We are aware of no law that requires a district court to rule in favor of an ERISA plaintiff merely because he has supported his claim with substantial evidence, or even with a preponderance."). MetLife's determination that the figure for Phillips's annual benefits compensation is $33,650 prevails if the decision has rational support in the record. *Id.* We conclude it does.

MetLife was vested with broad discretion, as described in the SPD, to decide, among other things, the amount of benefits due a claimant. The administrative record shows MetLife obtained the figure for Phillips's annual benefits compensation electronically from computer-generated records maintained for Verizon employees. The screen shots of the electronic records reference Phillips's correct benefit level (50%) as well as language from the SPD, specifically the 2008 SPD, by use of the terms "ABC Frozen Pay." MetLife confirmed the figure with Phillips's employer. The employer also verified the figure included an incentive award Phillips received in the rolling twelve month period beginning July 1, 2005, as indicated in the final

denial letter. Notably, the figure also ties to the raw data from the check stubs for the same period based on a calculation from facts in the record related to Phillips's employment. Printouts from a claim activity summary related to Phillips's LTD benefits show that MetLife representatives repeatedly spoke with Phillips's attorney about the annual benefits compensation amount, including how the figure reflected Phillips's salary and that it was adjusted after being incorrectly reported to MetLife. The claim activity shows that when Phillips questioned the amount of her annual benefits compensation, MetLife asked her employer to confirm the correct amount, which it did.

This information is more than a scintilla and constitutes concrete evidence in the record to support MetLife's decision that the amount of Phillips's annual benefits compensation was $33,650. Thus, based on the terms of the SPD and the evidence in the administrative record, we conclude MetLife's determination that the figure of $33,650 for Phillips's annual benefits compensation was reasonable. *See Corry*, 499 F.3d at 398 (review of administrator's decision "need only assure that the administrator's decision fall somewhere on the continuum of reasonableness—even if on the low end"). Because we conclude there is a reasonable basis in the record to support MetLife's determination of Phillips's annual benefits compensation, the trial court did not err in granting summary judgment in favor of appellees on this basis. We overrule Phillips's first issue.

### 2. Interpretation of the SPD for Pension Offset

In her second issue, Phillips challenges MetLife's interpretation of the offset provision in the SPD, specifically, MetLife's decision that pension benefits rolled over into an IRA constitute benefits Phillips "received" for purposes of an offset to her monthly LTD benefit. Phillips argues summary judgment in favor of appellees was improper because MetLife's interpretation

was legally incorrect. She also characterizes her issue as a dispute over the legal standards applied to interpret the language of the SPD.

The SPD authorized MetLife to reduce Phillips's monthly LTD benefit by benefits provided from other sources of disability income, including "[p]ension benefits from a Verizon pension plan, if [Phillips] elect[s] to receive them." Less than two months after MetLife approved her LTD claim for benefits, Phillips elected a lump-sum distribution of her pension benefits from her pension plan, which she then rolled over into a traditional IRA. When Verizon informed MetLife of her election, MetLife treated the rollover as pension benefits Phillips had elected to "receive," resulting in the reduction of her monthly LTD benefits.

In our two-step inquiry previously described, we first consider whether MetLife's interpretation was legally correct, and if it is, our inquiry ends because a correct interpretation cannot constitute an abuse of discretion. *Ellis*, 394 F.3d at 269–70; *Wildbur*, 974 F.2d at 637–38. We look to the facts in the record and the language of the plan itself in addressing the question of whether the interpretation was legally correct. *Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 n.72 (5th Cir. 2008). If the interpretation was legally incorrect, we proceed to the second step and analyze whether the incorrect interpretation was an abuse of discretion. *Wildbur*, 974 F.2d at 638. If we reach this second step, we must also weigh as a factor whether the administrator operated under a conflict of interest. *See Crowell*, 541 F.3d at 312.

Our analysis under the first step includes consideration of three factors. *See Wildbur*, 974 F.2d at 637–38. The second factor is said to be the "most important" because it involves the question of whether the administrator's interpretation is consistent with a fair reading of the plan. *Koehler*, 683 F.3d at 187. In answering that question, we use basic contract interpretation principles and interpret ERISA provisions "'in [their] ordinary and popular sense as would a

person of average intelligence and experience.'" *Crowell*, 541 F.3d at 314 (quoting *Tucker v. Shreveport Transit Mgmt. Inc.*, 226 F.3d 394, 398 (5th Cir. 2000)); *see also Corbello v. Sedgwick Claims Mgmt. Servs., Inc.*, 856 F. Supp. 2d 868, 881–82 (N.D. Tex. 2012). That is, we interpret the provisions as they are likely to be understood "by the average plan participant" with the language to be given its generally accepted meaning. *Crowell*, 541 F.3d at 314; *Chacko v. Sabre, Inc.*, 473 F.3d 604, 612 (5th Cir. 2006).

Phillips argues MetLife's interpretation of "receive" is legally incorrect because she had not "received" any pension benefits; rather, her pension benefits were transferred from one financial institution to another by direct rollover. She asserts that because the interpretation here involves the SPD as opposed to the Plan, we employ "more particularized standards" in reviewing whether MetLife's interpretation was legally correct and that the three factors under the first step "are not considered at all." She relies on *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 640 n.7 (5th Cir. 1999). The only particularized standard Phillips cites is the rule of contra proferentem, the canon of construction requiring us to construe any ambiguities in the language of the SPD in her favor. Although Phillips appears to assert the rule of contra proferentem forms the basis of the entire analysis under the first step, logically, this argument is more properly asserted with respect to the second factor; under this factor we use basic contract principles to answer the question of whether the administrator gave the plan a fair reading. *See Horn v. Owens-Ill. Emp. Benefits Comm.*, 424 Fed. Appx. 312, 314–15 (5th Cir. 2011) (per curiam) ("In addition to the [three] factors, there are some 'particularized standards' that apply in evaluating whether the administrator's interpretation of [the SPD], as opposed to the plan itself, is legally correct.") (internal citations omitted); *see also Crowell*, 541 F.3d at 314 (contract interpretation principles used under second factor). The heart of her

- 24 -

argument in fact, aligns with the second factor; she asserts MetLife did not give the SPD a fair reading because the word "receive" is ambiguous and, therefore, the provision must be construed in her favor. Appellees respond that the pension offset provision in the SPD is unambiguous and MetLife gave the provision a legally correct interpretation. Appellees also respond that the rule of contra proferentem does not apply when, as here, a plan vests the administrator with discretionary authority to interpret the plan.

Generally, where an administrator has express authority to interpret the plan, that discretion allows the administrator to resolve ambiguities in the plan language in its favor. *See Koehler*, 683 F.3d at 188; *High*, 459 F.3d at 579 (plan administrator may exercise "interpretive discretion" when construing ambiguous terms in ERISA plans). But this discretion does not extend to SPDs. *Koehler*, 683 F.3d at 188. Rather, ambiguities in the SPD must be resolved in favor of the beneficiary, even if the terms of the SPD are identical to the plan. *Id*. (citing *Rhorer*, 181 F.3d at 642). That is because SPDs must be "'written in a manner calculated to be understood by the average plan participant, and . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.'" *Id*. (quoting 29 U.S.C.A. § 1022(a)). SPDs "provide communication with beneficiaries about the plan" but "do not themselves constitute the terms of the plan." *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011). We only reach the rule of contra proferentem and construe the terms of the SPD in Phillips's favor, however, if a term remains ambiguous after applying ordinary contract principles. *See High*, 459 F.3d at 578–79 (holding rule of contra proferentem only applied when term is ambiguous); *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997).

The administrative record shows Phillips elected a lump-sum distribution of her pension benefits. Her election paid over $160,000 and required her spouse to consent to her request "to begin benefits now." As part of her election, she certified she had not "received a previous distribution" from the pension plan and that she understood the risk of loss associated with "receiv[ing] a lump sum distribution." Following her election, the Verizon benefits center sent Phillips a check payable to her bank for deposit into an IRA in her name. The check stub reflected the total amount for deposit was a "cash distribution" paid on January 1, 2009. Phillips, as the "IRA Holder," deposited the check and certified that the "funds contributed [were] eligible to be deposited into [her] IRA Plan."

The SPD for the Verizon pension plan and other documents associated with Phillips's election were presented as part of the administrative record. The other documents include a "Special Tax Notice Regarding Plan Payments"[11] that Verizon sent to Phillips in response to her request "to start [her] Disability Pension benefit . . . ." The pension plan SPD contains a section on "[h]ow taxes affect your pension." It informs that special tax rules apply to lump-sum distributions and explains that taxes will be withheld automatically from "your payment" unless there is a request for "a direct rollover of your distribution" to among other things, a traditional IRA. The special tax notice states that if Phillips chooses a direct rollover of her plan payment into a traditional IRA, no income tax will be withheld until she later takes the funds out of the IRA. The stated purpose of the tax notice to Phillips was to explain how she can "continue to defer federal income tax on [her] retirement savings" in the pension plan; it told her there was

---

[11]This document was among the attachments to an affidavit appellees submitted as part of the summary-judgment proceedings. Although Phillips objected to certain attachments, which she identified by bates numbers, because they were not included in the administrative record, this document does not appear to be included in her objections. This document was addressed to Phillips and contains the same date as the election form she included with her administrative appeal.

"important information" she would need before she decided "how to receive [her pension] Plan benefits."

Phillips contends the word "receive" is ambiguous because the tax rules applicable to requests for a rollover indicate she will not "receive" her pension funds until she has withdrawn them from her IRA and is taxed on the funds. She therefore maintains that under the rule of contra proferentem, the word "receive" in the SPD means that she "must obtain actual possession of the pension benefits by withdrawing them from her IRA without accomplishing another direct rollover," or stated differently, "receive" refers to "funds that actually come into the possession of Phillips" by withdrawal from the IRA. She maintains the word must have a different meaning than "eligible to receive."

Phillips finds support for her interpretation in *Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620 (9th Cir. 2007). Like here, the issue in *Blankenship* was whether a plan participant "received" his retirement funds for purposes of a deduction from his monthly disability payment when the funds were transferred from his employer's plan to a Vanguard IRA. *Id.* at 624. The court noted the term was not defined in the disability plan and that the parties defined the term as "to take into possession or control." *Id.* at 624–25. The court determined that because a definition of receipt based on possession and one based on control may lead to two separate outcomes, the term was ambiguous. *Id.* at 625. The court applied the rule of contra proferentem because the plan at issue did not vest the administrator with discretion to interpret plan provisions and construed the term as possession through actual receipt of funds. *Id.* Under that interpretation, the court concluded funds rolled over into an IRA were not to be offset against a participant's monthly disability benefit. *Id.* at 626.

Unlike the court in *Blankenship*, we do not consider the word "receive" to be ambiguous in the context of the SPD for the LTD Plan. *Cf. Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1097 (9th Cir. 2012), *cert. denied* No. 12-1144, 2013 WL 1147413 (Apr. 22, 2013) (holding pension benefits rolled into IRA were received by plan participant for purposes of LTD benefit offset because administrator had discretionary authority to review plan). The rule of contra proferentem therefore does not apply in this case. *See Corbello*, 856 F. Supp. 2d at 883.

The SPD states that to qualify for LTD benefits, Phillips must apply for all other types of disability benefits for which she may be eligible and that benefits provided from these sources will be subtracted from her monthly LTD benefit. The other sources of disability income include pension benefits Phillips elected to "receive." To "receive" means to "be given, presented with or paid (something)." THE NEW OXFORD AMERICAN DICTIONARY 1421 (2001). Similarly, the word means "to take possession or delivery of"; it implies that "something comes or is allowed to come" into one's possession. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1894 (1981).

Phillips attempts to demonstrate an ambiguity by relying on the pension SPD and special tax rules. She argues, in essence, that application of the tax rules renders the word "receive" in the pension offset provision ambiguous. Under her view, she has not "received" the benefits for purposes of calculating an offset from her LTD benefits because she will not be taxed on her pension benefits until a withdrawal from her IRA.

Consideration of the pension SPD and special tax rules, however, does not support an interpretation that a pension benefit was not "received" by a person because it was rolled into an IRA. A rollover is a way to move funds from one investment vehicle to another without being taxed on the amount; in this case, Phillips moved her pension funds from her employer's plan

into a traditional IRA that she set up through a bank. Such a rollover is reported to the IRS as evidenced by the Form 1099-R Phillips included in her administrative appeal. The decision to roll over the pension amount into an IRA is one of "several decisions" required of Phillips when she "requested to start" her pension benefit. As explained in the pension SPD, it is one of many ways in which Phillips could receive her payment.

Importantly, the special tax rules related to direct rollovers do not change the fact that a lump-sum distribution of Phillips's pension was paid to her or that a cash distribution came into her possession. The tax rules simply say Phillips will not be taxed on the lump-sum distribution of her pension benefits until she withdraws them from her IRA. The focus under the tax rules is receipt of the money from her IRA for income tax purposes. The rules tell her that if she receives the distribution but rolls over the amount to another investment vehicle, she can defer paying taxes on the amount. And because "pension payments are fully taxable in the tax year you receive them," Phillips would have paid taxes on the lump-sum distribution had she not converted the payment into an IRA.

Tellingly, the pension SPD and special tax rules repeatedly refer to the lump-sum distribution from the Verizon pension plan as a "payment" received by the participant. For example, the pension SPD provides Phillips can "receive [her] benefit as a single lump sum" and that "[w]ith a lump-sum payment, you receive payment of your entire accrued benefit in a single payment." The documents also refer to the distribution as an amount "received" by the participant, containing provisions for rolling over more than the amount received and providing a time for making a rollover: "You generally must complete the rollover of an eligible rollover distribution paid to you by the 60th day following the day on which you receive the distribution from your employer's plan."

The SPD at issue here and the pension plan SPD are distinct policies that apply in different situations. *See Loggins v. Nortel Networks, Inc.*, 206 Fed. Appx. 329, 331 (5th Cir. 2006) (noting separate employer plans should not be construed as single plan; "[a]lthough they have the single purpose of providing employee benefits, they are clearly distinct policies and apply in different situations."). The pension plan SPD concerns a person's eligibility "to receive any pension" earned under that plan, and it provides guidance for the ways in which the person can receive the payment. The context of the direct rollover provisions in the pension SPD and tax notice is significant because those provisions relate to the effect the rollover has on Phillips for income tax purposes. The pension offset provision in the SPD for the LTD Plan regards the pension benefits given or paid to Phillips regardless of how she chooses to receive the funds or what she does with the funds upon receipt. If, as here, she elects to receive her pension benefits, those benefits will be deducted from her monthly LTD benefit amount.

Although Phillips argues "receive" means "funds that actually come into [her] possession," she does not explain how the initiation of the process to elect a lump-sum distribution and "begin benefits now" does not show how her pension benefit did not actually come into her possession. She simply maintains that because she is not taxed on the amount, she did not receive it. While it is true she does not physically possess her pension distribution (the bank does), the reality is the bank simply holds the money for her benefit and operates as a custodian of the money to which she is entitled at any time. It was Phillips who initiated the process of electing a lump-sum distribution and made the decision to leave the purview of her employer's plan and roll the distribution into an IRA. She acknowledges she maintains control over the assets in her IRA. For example, after she deposited the "cash distribution" into her IRA, she divided her IRA into two accounts. *Cf. Day*, 698 F.3d at 1097 (pension beneficiary has

control over IRA assets, noting he "can choose the IRA and change it; and he can withdraw funds from it" and therefore it was "not unreasonable to say that he has *received* these benefits.").

Phillips also argues that in interpreting the SPD, MetLife applied Verizon's "undisclosed intent" rather than the language of the SPD. The administrative record does not support this argument. The claim activity report indicates that before MetLife sent the December 2008 letter regarding the pension offset to her LTD benefit, Phillips informed MetLife of her decision to commence a pension. The activity shows a November 2008 telephone conversation in which a MetLife representative advised Phillips that MetLife would confirm her election with her employer and that because of the election, there was a potential overpayment. The activity report also shows Phillips had an attorney at that time and there were repeated action items involving correspondence or conversations with Phillips or her attorney related to her election. When we consider MetLife's reading of the SPD in light of the circumstances surrounding Phillips's election of her pension benefit, we cannot conclude the interpretation was not disclosed.

The SPD requires that Phillips "receive" pension benefits before they can be offset from her LTD benefits. An average plan participant, based on the popular and ordinary meaning of the provision concerning an offset for pension benefits "received," would understand that the election of a lump-sum distribution from a pension plan, regardless of how the participant chooses to receive the distribution, would be paid to the participant, taken in by the participant, and within the participant's control. Thus, we conclude that a fair reading of the pension offset provision is that Phillips "received" her pension benefits when she rolled the lump-sum

distribution into an IRA.  The second factor in our determination of whether the interpretation was legally correct therefore weighs in MetLife's favor.

The first factor also supports the interpretation.  The first factor requires consideration of whether MetLife consistently applied the provision to similarly situated persons covered under the policy.  We ask whether MetLife has given the SPD a uniform construction.  *See Crowell*, 541 F.3d at 312.  Phillips does not address this factor.  Instead, she asserts the three factors used to analyze whether an interpretation was legally correct "are not considered at all" because the review involves the SPD; she argues the rule of contra proferentem applies.  While we agree the rule of contra proferentem is implicated when the interpretation involves the SPD (if there is an ambiguity), the rule is a more "particularized standard" that is used "in addition to the [three] factors" outlined as part of the analysis in the first step.  *Horn*, 424 Fed. Appx. at 314.

To support their contention that MetLife gave the SPD a uniform construction, appellees rely on the affidavits they attached as summary-judgment evidence—the affidavits of Donna Chiffriller, a Verizon subsidiary's corporate human resources vice president, and Matthew Hallford, a MetLife litigation specialist.  Chiffriller stated as part of her third paragraph that "any distribution of pension benefits from the Verizon pension plan made pursuant to a participant's election, including but not limited to a lump sum distribution . . . rolled over into an IRA is 'received' by the participant" as the term "receive" is used in the SPD.  Hallford testified in the fifth paragraph of his affidavit that "pension benefits are consistently offset" from disability benefits, "irrespective of the way the participant chooses to receive the pension benefit."  He added there were "instances where a participant has disputed the offset provision of pension benefits rolled over into a traditional [IRA]," MetLife's interpretation included rollovers to IRAs, and that the plan had been interpreted consistently to mean the participant "has received the

pension benefit even if he or she has rolled the benefit over into an IRA." Phillips objected to these statements and argues as part of her third issue that the trial court erred in overruling her objections.[12]

Judicial review of ERISA benefits determinations generally is determined from the administrative record, which "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300. But there are limited exceptions to this rule, such as "the admission of evidence related to how an administrator has interpreted terms of the plan in other instances." *Estate of Bratton*, 215 F.3d at 521; *see also Wildbur*, 974 F.2d at 638 ("Determining whether the administrator has given a uniform construction to a plan may require a court to evaluate evidence of benefit determinations other than the one under scrutiny."). Here, we conclude the statements made by Chiffriller, that any distribution of pension benefits would be offset because they are "received," and Hallford's statement that pension benefits are consistently offset from disability benefits regardless of how the benefit is received, fall within the exception and may be considered as part of our analysis. *See Estate of Bratton*, 215 F.3d at 521.

Phillips's final complaint is that the trial court erred by overruling her objection to paragraph five of Hallford's affidavit. Specifically, she argues "[s]aid paragraph is conclusory." Without deciding whether the rules of evidence are applicable, we conclude the trial court did not abuse its discretion by overruling the objection. *See Holloway v. Dekkers*, 380 S.W.3d 315, 320 (Tex. App.—Dallas 2012, no pet.) (reviewing trial court's decision to admit summary-

---

[12]Phillips specifically objected to Chiffriller's statement because she maintains it purports to express some person's or entity's intent as to the SPD and expressions of intent are irrelevant. She also objected to certain attachments to Chiffriller's affidavit because they were outside of the administrative record. We do not consider her statement about intent or the attachments as part of our analysis. Therefore, we need not determine whether the trial court properly overruled her objection on that basis. *See* TEX. R. APP. P. 47.1.

judgment evidence for abuse of discretion). Hallford identifies his personal knowledge of the statements in his affidavit regarding MetLife's procedures for processing and administering group disability plans, including claims under Verizon's LTD Plan. He outlines how Verizon notifies MetLife when a plan participant elects to receive pension benefits, including the amount of offset to the participant's LTD benefit. He then, in paragraph five, provides the referenced testimony regarding consistent application of the offset. Phillips does not complain Hallford did not have personal knowledge of the information. She also fails to identify what additional underlying facts she would require. On this record, we conclude the trial court did not err in overruling her objection to the entire paragraph as "conclusory." Thus, to the extent Phillips complains about the above statements of Hallford as part of her third issue, we overrule that issue.

Additionally, we note the affidavit statements regarding uniform application of the offset are consistent with the record. The claim activity report shows that MetLife consulted with Verizon about the interpretation of the pension offset provision and that Verizon informed MetLife that the offset was correct because Phillips elected to receive her pension benefits. Chiffriller and Hallford simply confirmed the interpretation presented in the administrative record.

The third factor in the analysis of whether MetLife's interpretation was legally correct is consideration of any unanticipated costs resulting from different interpretations of the Plan. *Ellis*, 394 F.3d at 270. Although appellees generally argue that Phillips's interpretation of the pension offset provision would result in the unanticipated costs of higher benefit payments, appellees did not present any factual support to guide us in determining the extent to which the interpretation would impose unanticipated costs on MetLife or VEBC. Phillips did not present

any argument related to this factor.  Consequently, we do not address this factor.  *See Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 258 n.4 (5th Cir. 2009).

Based on our review of the relevant factors, we conclude MetLife's interpretation of the pension offset provision was legally correct and, therefore, the trial court properly granted summary judgment on this basis.  We overrule Phillips's second issue.

### III.  CONCLUSION

We conclude the record shows a reasonable basis to support the calculation of Phillips's annual benefits compensation.  We also conclude MetLife's interpretation that lump sum pension benefits elected by a participant and rolled over into an IRA constitute benefits "received" by the participant for purposes of an offset to a monthly LTD amount.  Thus, the trial court properly granted summary judgment in favor of appellees.

We further conclude the trial court did not err in overruling Phillips's objections to paragraph five of the Hallford affidavit or statements outside the administrative record that fall within the exception.  We do not reach the merits of the trial court's other evidentiary rulings relevant to Phillips's third issue.  The evidence made the subject of these rulings would not affect our analysis or conclusion in this appeal.  *See* TEX. R. APP. P. 47.1.

Accordingly, we affirm the trial court's judgment.


/Mary Murphy/
MARY MURPHY
JUSTICE

110678F.P05

- 35 -



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOANN PHILLIPS, Appellant

No. 05-11-00678-CV          V.

METROPOLITAN LIFE INSURANCE
COMPANY AND THE VERIZON
EMPLOYEE BENEFITS COMMITTEE,
Appellees

On Appeal from the County Court at Law
No. 2, Dallas County, Texas
Trial Court Cause No. CC-10-06957-B.
Opinion delivered by Justice Murphy.
Justice Francis participating.

In accordance with this Court's opinion of this date, the trial court's judgment is **AFFIRMED**. It is **ORDERED** that appellees, Metropolitan Life Insurance Company and The Verizon Employee Benefits Committee, recover their costs of this appeal from appellant Joann Phillips.

Judgment entered this 10th day of May, 2013.

/Mary Murphy/

MARY MURPHY
JUSTICE